MATHEWS REAL ESTATE COMPANY, a Corporation, Appellant, v. NATIONAL PRINTING & ENGRAVING COMPANY, a Corporation.—48 S. W. (2d) 911.

Division Two, April 8, 1932.

*Polk, Williams & Campbell* for appellant.

192

*Nagel & Kirby* and *E. G. Curtis* for respondent.

COOLEY, C.—Suit for injunction brought and prosecuted in the Circuit Court of the City of St. Louis, to restrain the alleged violation of certain building restrictions and to compel the demolition and removal of defendant's building, erected in 1925 at a cost of $47,000. The amount in dispute is sufficient to give this court juris-

diction of the appeal. The suit was instituted May 11, 1925. It was tried and submitted in the circuit court January 11, 1928, and by the court taken under advisement until December 18, 1928, when the court rendered judgment dismissing plaintiff's bill, from which plaintiff appealed.

The restricted district in which plaintiff's and defendant's properties are located, consists of a single block about 1366 feet long, and about 446 feet wide, the longer dimension being east and west. It is bounded on its east and west ends by Sarah Street and Boyle Avenue respectively, on its north side by West Pine Street and on its south side by Laclede Avenue. It contains 54 lots. Lots numbered 1 to 27 inclusive front south on Laclede Avenue and lots numbered 28 to 54 inclusive front north on West Pine Street. Each lot is 50 feet in width except the four corner lots which are somewhat wider, and each lot has a depth of approximately 210 feet. Running lengthwise through the center of the block from Sarah Street to Boyle Avenue there is a paved alley 26 feet wide. Plaintiff owns lot 35 fronting on West Pine Street (which for convenience we shall call Pine Street). Defendant owns lots 19 and 20, fronting Laclede Avenue, lot 20 being directly south of and across the alley from plaintiff's lot and lot 19 east of and adjacent to lot 20. The block in question is now city block No. 3915, of the city of St. Louis.

In 1880 the land now comprising this block belonged to the Bank of California. It and the adjacent territory was then vacant, the city not having been built up that far west. The bank, desiring to sell, platted this ground and offered the lots for sale at an auction held June 9, 1880, having advertised the lots as desirable "for the purpose of elegant city homes, along the chief promenades to Forest Park, where all the more costly and ornate residence improvements seem to be tending." The advertisement contained this promise: "Conformably to the management generally urged for this region, the deeds to the bank property will be issued with prohibitory clauses against the starting or maintaining on it of any business or thing of nuisance to a first class residence locality; also, they will contain a clause establishing a building line 20 feet from the street line." The lots were all sold on June 9, 1880, and on the same day deeds were made to the various purchasers, each of which contained the following provision: "This deed is made, delivered and accepted subject to the following express restrictions and reservations, to-wit:

"First: No building of any description shall be erected upon the premises hereby conveyed any wall of which shall be nearer than twenty feet to the front line of said premises.

194

"Second: Unless the consent of every lot owner in said subdivision shall be first had and obtained in writing, duly executed and acknowledged, and recorded in the Recorder's Office of the city of St. Louis, there shall never be established, carried on, or conducted upon said premises, or any part thereof, or within any building or erection thereon, any manufacturing business, slaughter house, soap factory, dairy, livery stable or other nuisance, nor any dram shop, theater, circus or other place of business or public amusement that may be regarded as objectionable by the residents of a first class residence neighborhood."

Plaintiff and defendant both acquired title through mesne conveyances from purchasers at said sale of June 9, 1880. Plaintiff bought the property now owned by it in 1912. Defendant bought its lots 19 and 20 early in 1925. They were then vacant. Defendant bought with actual as well as constructive knowledge of the restrictions, intending to erect thereon its present building, which it completed that year. The building is a one-story brick structure covering both lots, extending from the building line twenty feet from the north street line of Laclede Avenue to the alley. The business conducted therein by defendant consists of the printing of posters, display advertising, certain kinds of tickets, etc. "We do display printing, such as window trims, cutouts, show cards, hangers, posters, fiber signs, muslin signs. We have what we call artists, and we design posters and display cards and things like that." It does not manufacture the materials upon which the printing is done, but fashions them from the sheet form in which they are purchased to meet the customers' requirements. At the time of the trial defendant had twenty-two or twenty-three employees, and had used in its plant some sixteen or eighteen machines, consisting of cylinder presses, job presses, cutting and numbering machines, etc., each operated by an individual electric motor. It purchased its electric power from a public service company. It used coal only for its two-boiler heating plant by which the building was heated. Its business amounted to aboue $150,000 a year.

Plaintiff in its petition made no claim that defendant's plant and business were offensive by reason of noise, smoke, odors, etc., or other operating conditions. Its contention seems to be that *any* manufacturing business in the restricted district constitutes a nuisance *per se* and is prohibited. It pleaded that defendant's building will depreciate the value of residences in the block and render the block less "desirable and useful as an exclusive residence block . . . by changing and lowering of the standard, class and character of the improvements. . . . for residence purposes;" that the block in question is considered by the owners of residences therein, especially those fronting on Pine Street as "an exclusive residence

block and district, and as such it was the intention and purpose of the original owners of all of said subdivision to maintain the standard, class and character of the improvements erected and to be erected," therein; that in establishing the district there was contemplated a general plan of improvement, the restrictions being for the benefit of all lot owners therein; that the carrying on by defendant of "the manufacturing business and kind of business" contemplated by it without consent of all lot owners, violates the restrictions "and the results thereof will be to injure the value, character and utility of the lots . . . and destroy the character of said district as a high class residence district, to the great injury and damage of owners of homes therein." It is not claimed that the building line restriction was violated.

The suit was filed before the building was completed. The petition prays that defendant be restrained from completing it or occupying it for the purpose intended, and also that, since it will be useless for any other purpose, the court order it wrecked and removed.

The defendant denied that the business it conducted was a manufacturing business or a prohibited business within the meaning of the restrictions; alleged facts showing, as it claimed, that the district had not developed into a first class residence district and that if it could ever have been so considered it had completely lost such character before defendant—or plaintiff either—purchased their respective lots, because of changed conditions and development in that and surrounding blocks, and that if the restrictions as to business had ever been operative they had ceased to be so before defendant's purchase because of such changed conditions; that plaintiff had failed to object to other business enterprises which had sprung up in the block prior to defendant's purchase and therefore "had waived, lost and abandoned any claim" that defendant's business violated the restrictions, and was "barred" from raising such objections, against defendant; and that it had commenced its improvement and expended considerable money thereon before it had notice from plaintiff that the latter objected to the proposed building or business.

It is not claimed that defendant obtained consent of the lot owners in the restricted block to the erection of its building and the carrying on of its proposed business therein.

■ I. The question that first requires determination is whether or not the business conducted by defendant is a "manufacturing business" within the meaning of the restriction and prohibited for that reason regardless of its character. It may be conceded for the pur-

pose of this case that, technically, it is a manufacturing business, because the materials purchased and used by defendant are altered by its processes and made up into the different finished products desired. So the making of men's or women's clothes by hand or by machinery, would be manufacturing. But was the term "manufacturing business" used in such general and all-inclusive sense in the conveyances referred to? For convenience of reference we here repeat the restriction claimed to have been violated. It provides that there shall not be established or conducted "any manufacturing business, slaughter house, soap factory, dairy, livery stable or other nuisance, nor any dram shop, theater, circus or other place of business or public amusement that may be regarded as objectionable by residents of a first-class residence neighborhood." The prohibited occupations seem to fall into two classes:—first, any manufacturing business, slaughter. house, soap factory, dairy, livery stable or *other nuisance;* second, any dramshop, theater, circus or other place of business or public amusement that may be regarded as objectionable by residents of a first-class residence neighborhood. ▮ Manufacturing business is named in connection with other things which inevitably would be of the nature of nuisances in a first class residence neighborhood, followed by the words "or other nuisance," indicating that all of the things previously named and intended to be prohibited were considered by the grantor to be necessarily nuisances.

Many kinds of manufacturing businesses, especially on a large scale, would no doubt fall in that category. But, could a small, unobtrusive tailoring business or dress making business, for example, be considered as of the same class or character in that respect as soap factories, slaughter houses, etc.? The restrictions do not purport to prohibit *all* business and industrial occupations. The purpose evidently was to prohibit only such as would be offensive or objectionable in a residence neighborhood because of their nature, or their tendency to interfere with the orderly peace and comfort desirable in a district devoted to well-to-do homes. Such purpose is indicated not only by the wording of the restrictive provision in the deeds but by the published advertisement of the sale pursuant to which the deeds were made. In that advertisement it was stated that the deeds would contain clauses prohibiting *any business or thing of nuisance* to a first-class residence locality. That the phrase "of nuisance" etc., was intended to modify the word "business" as well as "thing" is apparent, because in incorporating the promised prohibition into the deeds *all* "business" is not forbidden. Had the intention been to exclude from the block business of any kind the restrictive clause of the deeds should and would have so stated.

██ "The law favors the free and untrammelled use of real property. Restrictions in conveyances of the fee are regarded unfavorably and are therefore strictly construed." [Scharer v. Pantler, 127 Mo. App 433, 437, 105 S. W. 668. See, also, Williams v. Carr, 213 Mo. App. 223, 225, 248 S. W. 625; Charlot v. Regents Mercantile Corporation (Mo. App.), 251 S. W. 421, 423; Breadon v. Paugh, 330 Mo. 127, 48 S. W. (2d) 853.] Being in derogation of the fee conveyed by the deed, such covenants will not be extended by implication to anything not clearly expressed in them, and if there be ambiguity in the terms of the covenant or substantial doubt of its meaning, such ambiguity should be resolved, if reasonably it can be, in favor of the use complained of. [Bolin v. Tyrol Investment Co., 273 Mo. 257, 262, 200 S. W. 1059; Breadon v. Paugh, supra.]

In our opinion the term "manfacturing business" as used in the restrictive clause of the deeds was not intended and should not be construed to mean any and all business that technically is manufacturing, but only such as from its nature or extent or the manner of conducting it would amount to a nuisance. There was no showing that defendant's business is of the latter character.

██ II. The second class of restrictions above indicated consists of "any dram shop, theater, circus or other place of business or public amusement that may be regarded as objectionable by the residents of a first-class residence neighborhood." That dramshops would be objectionable is obvious. Theaters and circuses tend to attract large crowds of people. If we apply the rule of *ejusdem generis* a business such as that of defendant would not be included in this class of prohibited occupations, at least unless it were shown, as it was not, that it was so conducted as to bring about conditions similar to those produced by the places or occupations specifically named. There is nothing in the record before us to indicate that defendant's business, either from its inherent character or the manner of its operation is more objectionable in a residence district than any other orderly and well-conducted business enterprise.

III. Plaintiff contends that the plan pursuant to which the block in question was originally platted and the lots sold, and the fact that these restrictions were written at that time in all of the deeds evidence an intention to make of the restricted territory a first-class residence district and that it became and is in fact such; and further that even if defendant's business is not absolutely prohibited because it is a "manufacturing business" (for which reason of itself plaintiff contends it is prohibited) it is nevertheless subversive if the scheme and purpose of the improvement and violative of the pro-

hibition against "other place of business . . . that may be regarded as objectionable by the residents of a first-class residenc neighborhood."

In view of the fact that business enterprises generally were not forbidden the restriction against "other places of business" etc., following the enumeration of places of certain character which would naturally be objectionable in a residence district could hardly be held to include a business such as that of defendant without a further showing than was made in this case. But even if the language used permits the construction contended for by plaintiff it cannot avail plaintiff in this case as we shall attempt to show. We agree with plaintiff that the restrictions contemplated a general scheme of improvement and were intended to be binding upon and to be for the benefit of all purchasers of lots and their respective grantees. Doubtless also it was contemplated that the restricted district should become and remain a residence district somewhat, at least, exclusive in character. But it is clear from the evidence that the block as a whole did not develop into an exclusive or even exclusively residential block; and if it ever could have been properly considered a "first-class" residence block it had lost that character long before defendant purchased therein and also we think before plaintiff purchased. For an understanding of the situation in this respect a further statement of the facts disclosed by the evidence is necessary.

When defendant purchased in 1925, as we understand the record, the block was built up, except defendant's said lots 19 and 20 on the Laclede Avenue side and perhaps three lots on the Pine Street side, two being near plaintiff's property. On the Pine Street lots there were erected about that time (the exact time is not quite clear) three buildings designated by some witnesses as apartment buildings. Mr. Mathews, President and practically sole owner of plaintiff Company, for whose residence plaintiff's property in question was acquired and who resided therein, spoke of these buildings as three four-flat apartment buildings. He testified in regard to them—"nobody wanted to build residences and they built flats. They were under the impression that flats could be built." We may observe here that impression appears to have been general and, from the absence of restrictions against such buildings, justified. The significance of Mr. Mathews' testimony that "nobody wanted to build residences" will be apparent as we proceed. The buildings fronting on Pine Street are all individual residences except the apartment or flats referred to. They are substantial buildings and when erected a good many years ago may have ranked as residences of somewhat exclusively high type, but could hardly be so considered now. In 1925 when defendant bought, the Laclede Avenue, Sarah Street and

Boyle Avenue frontages presented a different picture. The buildings fronting on Sarah Street were commercial and flat buildings built to the street line. That frontage is largely commercial. Fronting on Boyle Avenue there was only a row of flats. On the Laclede Avenue side of the block there were but one or two individual residence houses, rather old. At the corner of Sarah Street and Laclede Avenue, on the Laclede side of the block there was a drug store with offices above. Next to that on Laclede there was a grocery store, also with offices above. Farther west on that side of the block there were one or two other stores, an upholstering business, an undertaking establishment (being built when defendant bought) which business places displayed advertising signs, and the following signs advertising business enterprises conducted in buildings adjacent to the alley, on the Laclede side of the block, viz: "New Built Repair Shop," "Dog Hospital," "Cold Tire Setter Company." Adjacent to the alley on the Pine Street side of the block were the following business places, as indicated by signs displayed: "Clark Auto Repair Company," "West Pine Auto Repair Company," "E. J. Racmdonch, Plumber." There was reference in the evidence also to a machine shop operated by one Kelly and to an automobile and battery repair shop on the alley, but these may be included in the list we have enumerated. There were some other minor business enterprises conducted adjacent to the alley. At the rear of the building on the Pine and Sarah Street corner a barber shop had been opened. In six of the residences fronting Pine Street "furnished rooms" signs were displayed. There were eight of such signs on the Laclede frontage. Most of the frontage on Laclede Avenue— all except as above indicated—was occupied by a large number of two-story flats.

Double-track street car lines run through Sarah Street and Laclede Avenue, crossing each other at the Laclede-Sarah Street intersection. The entire block between Pine and Laclede east of Sarah Street is wholly industrial and commercial and the south side of Laclede Avenue, opposite the restricted block in question for its entire length, is given over to manufacturing, industrial and commercial business.

Two witnesses called by defendant, real estate men of long experience and familiar with the neighborhood, its environs and history, testified that the block in question was not a first-class residence district and had not been for at least the past ten years. Several witnesses for plaintiff testified that the Pine Street side was considered a residence district and one only said the Laclede side was considered residential, but none of them spoke of either side as a first-class residential district. Most of the buildings now in the block in question have been there a long time. Such as have been

built in recent years have been flats or business structures. No individual residences have been built there for many years, and the evidence indicates that there is no reasonable ground for hope that any will be in the future or would have been had the ground on which defendant's and other recent structures were erected been left vacant.

The foregoing outline of the evidence indicates the situation in the block and its immediate vicinity. We have been aided in visualizing it by photographs introduced in evidence and filed here which show all four sides of the block in question. Without further detailing the evidence it may be said that it is apparent from existing conditions and the persistent drift of business and industrial enterprises into and about this section of the city, which were patent when defendant bought and must have been observable when plaintiff bought, the restricted district had long before defendant's purchase lost, if it ever had, the character of a first-class residence neighborhood and that such character cannot be restored. In so far as the restrictions were designed to make and keep it a first-class residence district they had ceased to be effective, if they ever were, before defendant bought therein and also we think before plaintiff purchased its property. We are convinced that the enforcement of the restriction against the defendant in the circumstances shown in this case could be of no substantial benefit to plaintiff. In Rombauer v. Compton Heights Christian Church (Mo.), 328 Mo. 1, 40 S. W. (2d) 545, 552, it is said that "When . . . the restrictive agreement is induced by the then existing condition and surroundings of the realty in the covenanted area, and assumes its continued availability for particular uses, if a radical change takes place in the whole neighborhood such as defeats the purpose of the restrictions and renders their enforcement inequitable and oppressive, equity will not enforce them, but will leave the complainant to his remedy at law. [Citing authorities.] This is not on the theory that the contract, as such, fails to cover the situation and does not apply to it, . . . but it is because the changed conditions forbid equitable intervention." The principle is discussed at some length in that case, with citation of authorities and reference to comprehensive notes on the subject in 28 L. R. A. (N. S.) page 706 and 54 A. L. R. page 812. As we understand that decision it approves the holding in Trustees of Columbia College v. Thacher, 87 N. Y. 311, 317, 41 Am. Rep. 365, to the effect that when subsequent events and changed conditions, though without fault or laches on complainant's part, have rendered performance of a restrictive covenant by the defendant so onerous as to make its enforcement impose great hardship upon him and yield *little or no benefit* to the complainant.

equity should withhold its hand; and this we believe to be the correct principle, sustained by the greater weight of authority. [See, also, on this point Koehler v. Rowland, 275 Mo. 573, 587, 205 S. W. 217; Pickel v. McCawley (Mo.), 329 Mo. 166, 44 S. W. (2d) 857.]

IV. Plaintiff offered to prove by Mr. Mathews that "frequently in the operation of this plant at night, the glare of the lights from the rear windows of the plant have been annoying and objectionable to him, lighting up his end or rear rooms; and that from time to time the smokestack has emitted smoke in considerable volume which has been blown against and into the rear of the residence occupied by this witness." The court sustained defendant's objection to that evidence. Annoyance to plaintiff or to Mr. Mathews through the operation of the plant was not pleaded, nor urged as a ground of recovery. But if we treat the offered testimony as being in the case, which we may do, this being an equity case, it could not change the result.

The conclusion we have reached renders it unnecessary to discuss the question of waiver and estoppel raised by defendant's answer. In our opinion for the reasons above indicated the judgment of the circuit court was right and should be affirmed. It is so ordered. *Westhues* and *Fitzsimmons, CC.,* concur.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All of the judges concur.