SAMUEL BREADON ET AL., Appellants, v. ALICE JOSSUP PAUGH.—48 S. W. (2d) 853.

Division Two, April 8, 1932.

*T. M. Pierce* and *Samuel H. Liberman* for appellants.

*Frank J. Quinn* and *Frank Coffman* for respondents.

WHITE, P. J.—The plaintiffs sought by injunction to restrain the defendants from using the defendant's lot in violation of certain building restrictions. Judgment was for defendant dismissing the bill and the plaintiffs appealed.

The defendant was the owner of Lot 16, Euclid Place, a subdivision of City Block 2963 of the city of St. Louis. In October, 1905, the Kenlee Realty Company, a corporation, owner of the said Block 2963, platted Euclid Place imposing certain building restrictions, among them the following:

"But one building, and the stable and subsidiary buildings thereto shall be erected or placed upon each lot, and such buildings shall never be used or occupied for any purpose except that of private residence exclusively, nor shall any part or portion thereof be used or occupied as flats, nor shall any lot or portion thereof ever be used or occupied for trade or business of any kind whatsoever, or for hotel or apartments, or boarding house purposes, excepting only the corner lots, which, in addition to use for residences, may also be used for offices of licensed practitioners of medicine or dental surgery, in the active pursuit of their professions."

Defendant acquired title to the lot by a deed reciting that the conveyance was subject to those restrictions.

Lot 16 Euclid Place was situated at the southeast corner of Westminster Place and Euclid Avenue, fronting 74 feet, 9 inches on Westminster Place, with a depth of 152 feet, 6 inches southward to the alley. The lot narrows to the south until at the alley it is only about 11 feet wide.

The amended petition upon which the case was tried alleged that the defendant had erected on that lot an "office building" intended and designed to be used for business purposes. The use is then described. The defendant's husband, Dr. Paugh, was an internist

with an office in the building and she had permitted the building to be used by a surgeon, a specialist in eye diseases, a specialist treating the ear, nose and throat, a specialist treating genito-urinary diseases, a specialist in pediatrics, and a dentist, and that such use was in contravention of the restrictions set out above.

The suit was filed in October, 1928; the original files were offered in evidence. They do not appear in the abstract of the record, but it does appear from the colloquy in court on the objection to the introduction of the files that the original petition sought to restrain the erection of the building complained of; that a temporary restraining order was not granted at the time and the request for it was finally withdrawn.

The amended petition filed in May, 1929, sought only to restrain the *use* of the building. The prayer for relief was:

"That the defendant and each and every person acting under her and in her behalf be restrained from using the said lot or building thereon as an office building or from carrying on any trade or business or for any purpose other than a private residence exclusively and for such other relief as to the court may seem proper in the premises."

The building which the petition designated as an office building was a one-story structure having the appearance of a bungalow. The front on Westminster Place was used for residence. It was not occupied by Mrs. Paugh nor her husband, but by Mr. and Mrs. Baker, Mrs. Baker being laboratory technician for Dr. Paugh. The south part of the building was devoted to offices with the entrance on Euclid Avenue. It was separated from the residence part by a wall, and there was no access from the office part to the residence part. A sign was at the Euclid Avenue entrance, "Pre-Diagnostic Institute" with the names of some doctors and a dentist on it. The building was described by Dr. James H. Ready, who had one of the offices; he said there were six rooms, exclusive of the secretarial room, one room being used by the ear, nose and throat man, one by the dentist and one by the physio-therapy man, one room for X-rays and two consultation rooms. The structure was one story. Two or three witnesses, doctors, testified for the plaintiff to the effect that a Pre-Diagnostic Institute had formerly been Pre-Diagnostic Clinic; that the word "pre-diagnostic" was a term unknown to the profession. That a diagnostic institute was a clinic, and a clinic was a group of men combining together for the practice of medicine.

One witness, Mr. Kavanaugh, examined the building as it was being constructed. He explained the situation of the rooms; one reception room, a hall running straight through, and there were

"six little offices, little bitty places; could not be used for anything except maybe a patient or two and a doctor."

The plaintiff introduced photographs of the building, the Westminster front and the Euclid Avenue entrance, and the photographs of handsome residences in the neighborhood. Plaintiff also introduced an announcement sent out by Dr. Paugh, as follows:

"Announcement

"After February 17, 1929, we will be located in our own new building at

444 North Euclid Avenue

"Two blocks south of Delmar Blvd.

"P. G. Paugh, M. D. _____ Internist
"Sam F. Wennerman, M. D. _____ Surgeon
"Geo. L. Tonelli, M. D. _____ Ear, Nose and Throat
"L. M. Ochs, M. D. _____ Eye
"J. H. Ready, M. D. _____ Genito-Urinary Diseases
"Wm. S. Holycross, D. D. S. _____ Dentistry
Telephone: Delmar 4870."

This showed the intended use of the building. Of the six names on this announcement, Dr. Ready testified that his office was on Shaw Avenue and not in this building. That he goes to the building to help Dr. Paugh, and that he has examined his own patients in the building, making X-ray examinations, and that he has no financial arrangements with Dr. Paugh; that he helps out Dr. Paugh and Dr. Paugh helps him; that he is not a specialist; that the announcement was sent out, however, without any objection on his part.

Dr. Sam Wennerman testified that he had his office in this building and engaged in the general practice of medicine and surgery; that he had no patients of his own, but helps Dr. Paugh treat patients on the premises and receives from Dr. Paugh a weekly salary.

Dr. Tonelli testified that his office is in the building; that he has some patients of his own whom he treats on the premises; that he has a financial arrangement with Dr. Paugh whereby he is compensated on a percentage basis; that he does not assist Dr. Paugh in internal medicine.

Dr. Holycross testified that he was a dentist and had his office in the building; that he does not purport to act as an assistant to an internist nor to a surgeon; that some of the patients employed the witness directly, and that the witness in lieu of paying rent to Dr. Paugh rendered certain services.

Dr. Ochs testified that he had no special office in the building b-- came to the premises about every afternoon and examined patients there for eye trouble.

Dr. Soper, witness for plaintiff, testified that a physician might have one assistant and yet not be conducting a clinic, but if he had a dentist, or any other specialist with him, he would be doing group medicine. He said also that a surgeon could not be an assistant to an internist, nor could a doctor specializing in genito-urinary diseases; that an internist could not be an assistant to a dentist nor to an ear, nose and throat man.

I. While the plaintiff complained of the building as an office building in design, relief sought on that ground was abandoned, apparently after the building was erected, by the filing of the amend-ed petition tendering issues only as to the *use* of the building. Of course a building with a single doctor's office would be an office building. We must construe the restriction set out above with reference to the use which the evidence shows. That part which says:

"Nor shall any lot or portion thereof ever be used or occupied for trade or business of any kind whatsoever . . . excepting only the corner lots, which, in addition to use for residences may also be used for offices of licensed practitioners of medicine or dental surgery in the active pursuit of their professions."

In interpreting a building restriction we must have in mind that the use of land in any lawful mode shall be unhampered and the courts will not extend the effect of a restrictive covenant beyond the clear meaning of its terms. [Sanders v. Dixon, 114 Mo. App. 252, 253; Zinn v. Sidler, 268 Mo. l. c. 689, 187 S. W. 1172; Scharer v. Pantler, 127 Mo. App. 433; Pierce v. St. Louis Union Trust Co., 311 Mo. 287, 278 S. W. 398, 7 R. C. L. p. 1115, sec. 31; 18 C. J. 387.] The appellant cites the case of Strauss v. Nichols Land Co., 327 Mo. 205, 37 S. W. (2d) 505, quoting the opinion where it says the rule that a covenant must be construed most strongly against the grantor does not apply between parties who derive their title from the same grantor. In that case the court was not construing a restrictive covenant, but construing a covenant for the extension of restrictions, which was held to be a power vested in certain parties interested in the restrictions. It was held further that the coven-ant was not ambiguous, but placed the power of extension in the parties who sought to organize it.

The covenant here is a restrictive covenant upon the use of the property, and if there is ambiguity in its terms such ambiguity may be resolved, if reasonably it can be, in favor of the use complained

of. This subject has been before the courts of appeals much oftener than before this court and some of the cases cited from those courts are informative. Sanders v. Dixon, supra, cited by appellants, is where Judge Goode construed a covenant restricting the buildings upon a lot. The opinion said that whether a building is one dwelling house or more depends upon whether it was planned and constructed for plural homes as much as upon the actual use of it by several families for their homes. The building in question was a double two-story and attic building with a division wall running through it on the center line of the lot, front to rear and from cellar to roof. Either side was a separate, complete and distinct building, and was in violation of the covenant. Pank v. Eaton, 115 Mo. App. l. c. 175, 176, the same court, opinion by the same judge, had for consideration a house, a flat of two stories in height, planned for separate occupancy by two families, one on the second floor and one on the first floor. It was held that it was one house, not two: that the use of the building for two families was not in violation of the restriction, although it was planned and constructed for the use of two families, that the covenant against more than one house did not prevent the plural use of the house.

■ II. The appellant contends for a construction of the exception which would restrict the use of a corner lot to that of a residence where a single physician or a single dentist could receive and treat patients on the premises. That interpretation would put language into the exception which is not there. It would have been easy, if it had been the intention of the parties, to say "excepting that upon any corner lot the owner in addition to a residence may have *an* office for the practice of medicine or dental surgery." But it does not say that. It is argued that the plural was used because it was meant to apply to all the corner lots. That necessarily would make the exception ambiguous. The exception says that corner *lots in addition to residences, may also be used for offices* not the residences, but the "corner lots" may be used for offices. In accordance with the rule that restraint upon the free use of property in order to be enforced must be in words clearly expressed (Bolin v. Investment Co., 273 Mo. l. c. 262, 200 S. W. 1059), it cannot be construed to restrict such use to a single office of a single practitioner on each corner lot.

Dr. Paugh did not live on the premises, but it was a residence. Since the objection to the building has disappeared we have only to consider the use; the fact that the residence portion was separated from the other portion is not important. Mrs. Baker who occupied the residence portion assisted in the Doctor's office.

.

134

The announcement sent out by Dr. Paugh amounted only to an admission as to the use. It was not posted up in front of the building. It was rather extravagant when compared with the actual use of the building. Dr. Paugh himself, it seems had entire control of the building. Two of the physicians named in the list had no offices there at all—Dr. Ochs and Dr. Ready. Dr. Wennerman was simply an assistant and was paid a weekly salary by Dr. Paugh; Dr. Tonelli was compensated by Dr. Paugh on a percentage basis. Dr. Holycross was a dentist. He did not pay rent to Dr. Paugh but rendered certain services for it. The practice of these different physicians hardly justified the inference which the plaintiff draws from Dr. Paugh's announcement. Probably it was a little extravagant to call that arrangement a clinic. Was that use of the building clearly in contravention of the restrictive covenant? It is admitted by appellant that a doctor may have an office in the corner building and have an assistant. For the same reason he may have two assistants. There is no reason why he should not have an associate or two associates. Or have other doctors come there to treat patients as he would go to their offices to treat patients. Unless the interpretation of the plaintiff prevails that the covenant means what it does not say, that only one office and one physician with perhaps an assistant should practice on one lot, then the covenant was not violated by having several physicians practice so long as there is only one building adapted for the purpose of an office or offices. The six "little bitty places" described by Mr. Kavanaugh were no doubt rooms where a doctor could consult and examine his patients. As a matter of common knowledge one doctor often has several such little rooms. It appears that the place was hardly adapted to more than two or three doctors practicing there independently of each other, and the one person who was independent of Dr. Paugh was a dentist, and he didn't pay rent but rendered services to Dr. Paugh. In view of the terms of the restriction that corner lots may be used for offices of licensed practitioners of medicine or dental surgery, we do not think that the use of the building violated that restriction, that two or more physicians in the offices as arranged there and as the practice was, would not be such violation. ■ Appellant emphasizes the use of the word "or" in "medicine 'or' dental surgery" as if it might be one or the other, and could not be both in use on the same corner. It could be said that the connective "or" was used to express different kinds of practice that might be engaged in there, because the same practitioner would not be a general practitioner and a dental surgeon. The exception says "practitioners of medicine or dental surgery" not "a" practitioner of medicine or dental surgery.

It is argued by appellant that if more than one physician may have an office on a corner lot, then there is no limit to the number that may have offices there. We are not called upon to decide any such question nor to determine when and where there would be a limit. We have only to determine whether the use of the building, as the evidence shows here, is in violation of the covenant.

There was evidence by some of the witnesses that they bought their lots in the neighborhood on the supposition that none of the corner lots would be subjected to a use such as described here. There is some evidence that numerous automobiles were stopped adjacent these offices. So far as any such facts affected the issues the finding of the court necessarily resolved them in favor of the defendants by dismissing the bill. We think that the evidence supports the finding of the trial court that the use of the building as described was not in violation of the restrictive covenant.

The judgment is affirmed. *Henwood, J.,* concurs; *Ellison, J.,* absent.