William TRACY; Christopher Biller; Gerald Hoskins and Florence Hoskins, Husband and Wife; Gerald S. Fitzgerald and Dorothy Fitzgerald, Husband and Wife; and Forrest E. Jones and Lois J. Jones, Husband and Wife (Plaintiffs), Respondents,

v.

Melvin R. KLAUSMEYER and Thelma M. Klausmeyer, Husband and Wife; and Holiday Recreational Club, Incorporated, a Corporation (Defendants), Appellants.

No. 29764.

St. Louis Court of Appeals.

Missouri.

Sept. 3, 1957.

Forrest M. Hemker and Greensfelder, Hemker & Wiese, St. Louis, and Theodore C. Bruere, St. Charles, for appellants.

Joseph B. Wentker, St. Charles, and Fordyce, Mayne, Hartman, Renard & Stribling and Joseph R. Long, St. Louis, for respondents.

MATTHES, Judge.

Plaintiffs, respondents, as the owners of certain lots in a subdivision in St. Charles County, Missouri, seek to enjoin the defendants from using Lot 1 in said subdivision for commercial, mercantile, or business purposes. From the decree which granted plaintiffs the relief sought, the defendants have brought the case to this court for review.

There is no dispute concerning the relevant facts. In April, 1941, Charles G. Gross and his wife subdivided into eighty lots a tract of land containing approximately eighty acres lying between the tracks of the Chicago, Burlington & Quincy Railroad and the Mississippi River, and designated it as Karmill Wood Acres Subdivision. Lot 80, being the largest in area, is in the east part of the subdivision and contains approximately thirty acres. A portion thereof was burdened by a United States Flowage Easement. Lot 1, directly involved in this con-

troversy, and designated on the plat as Karmill Wood Park, is in the northwest part of the subdivision and consists of approximately ten acres. Originally this area was rough land, the northern boundary thereof being the Mississippi River. A strip in the south and east part of Lot 1 was also subject to United States Flowage Easement. This lot in its entirety was subject to overflow when the river was at flood stage. Lots 69 and 78 are east of Lot 1, and south of the river.

Incorporated in and made a part of the plat are certain covenants which impose restrictions upon the lots. The pertinent portions of the instrument creating the restrictions are:

"We, Charles G. Gross and Mildred Gross, his wife, proprietors of the Karmill Wood Acres Subdivision, do hereby establish the following restrictive covenants, by covenants running with the land and binding on every lot in the said subdivision intending that these restrictive covenants are to be for the benefit of every lot in said subdivision.

\*   \*   \*   \*   \*   \*

"3. No lot in this subdivision shall be used for commercial, mercantile or business purposes excepting Lots 69, 78 and 80.

"4. No lot in this subdivision may be subdivided excepting lots 69, 78, and 80.

"5. Only one dwelling may be erected or constructed on each lot in the subdivision excepting lots 69, 78, and 80.

\*   \*   \*   \*   \*   \*

"8. It is expressly understood that the owners of the subdivision reserve the right for themselves, their heirs and assigns to subdivide further lots 69, 78, and 80, or any part thereof, subject, however to the same conditions, restrictions, reservations, and covenants as above set forth.

"9. Lot No. 1 shall be known as Karmill Wood Park; and, while the title to said lot 1 remains in Charles G. Gross and Mildred Gross, his wife, said lot may be used in common as a play ground and picnic ground by the owner or owners of all other lots in said subdivision. All owners of lots in said subdivision shall, at all times, have the right to go over and across lot No. 1 as a means of access to the river front. The right to use said lot No. 1 as a picnic and playground shall be subject to the right and privilege of said Charles G. Gross and wife to lease, rent, and let, by the day, any part or portion of said lot No. 1 to the public for picnic purposes."

Following the filing of the plat with the restrictions attached thereto, lots were sold, and it appears that the subdivision was developed as a residential area. At the time of the trial between fifty-five and fifty-seven dwellings of a permanent character had been constructed upon lots in the subdivision. The value of these homes ranged upward from $6,000. A parking lot and tavern were being operated on Lots 78 and 80.

The Grosses' ownership of Lot 1 terminated on August 8, 1945, when they sold and conveyed Lots 1, 69, 78, 80 and nine others to William E. Smart and his wife. On occasions Lot 1 had been rented by Gross and his wife for picnic purposes. Smart also utilized the same lot commercially for picnicking and camping purposes. During the Smarts' ownership of Lot 1, they caused a channel to be dug thereon to the Mississippi River for the purpose of creating a harbor for boats. While the project was not completed by the Smarts, it was developed by them to the point where they were able to and did make a charge for boat space in the channel or harbor. The use of Lot 1 by the Smarts caused them to encounter considerable opposition by certain of the lot owners, who were contending that the restriction against use for commercial purposes

was being violated. It would appear that for this reason the Smarts disposed of Lot 1 by selling the same to defendants Klausmeyer on November 10, 1954. Following their acquisition of the property the Klausmeyers began extensive improvements thereon particularly with respect to the boat harbor. They caused it to be deepened and widened. A bridge was constructed across the channel to permit lot owners to reach the river. At the time of the trial the harbor could accommodate approximately 120 boats at one time, and space had been let or rented for 110 boats, thirty of which belonged to owners of lots in the subdivision, who were charged $30 per season for the privilege. Nonowners of lots were charged $50 for a 14-foot boat, $55 for a 16-foot boat, and $60 for an 18-foot boat. As a part of the overall project of improving Lot 1, the Klausmeyers constructed a road across the upper end of the harbor, and provided parking facilities on the lot. They also erected 22 picnic benches and 8 barbecue pits thereon. For the privilege of using the picnic equipment a charge was made of $1 a car, or 25¢ a person.

On the 19th of May, 1955, a certificate of incorporation was issued by the Secretary of State to the defendant Holiday Recreational Club, Incorporated, evidencing that said club had been incorporated under the General Business Act of Missouri. Defendants Klausmeyer were shown to be the owners of all but one share of the stock issued by the corporation. On the same date the certificate of incorporation was issued, defendants Klausmeyer conveyed Lot 1 to the Holiday Recreational Club, Incorporated, the owner thereof at the time of the trial.

Mr. Klausmeyer freely admitted that he knew that lot owners objected to the use made of Lot 1 by the Smarts, former owners, in fact, he attended a meeting of the owners where that question was discussed. Notwithstanding his knowledge of the attitude of the lot owners and their objection to the use of the lot for commercial purposes, the Klausmeyers immediately put into operation the steps which led to the improvements to which we have already referred.

Although defendants concede that they have been using Lot 1 for business and commercial purposes, and intend to continue doing so, they insist that operating a business thereon does not constitute a violation of the restrictive covenant with which all lots in the subdivision except 69, 78, and 80 are burdened.

Before attending to the principal point here presented, reference should be made to the procedure that the trial court chose to follow preliminary to the trial of the case. To the petition for injunction the defendants filed their second amended answer and counterclaim. In the counterclaim defendants asserted that there were other lot owners not parties to the action but who, on account of the relief sought in the counterclaim, were necessary parties. The names and addresses of such lot owners were listed by defendants in the caption of their said pleading. Defendants further alleged that the rights and privileges of user, easement, and access created by paragraph 9 of the instrument expired and terminated when Gross and his wife sold and conveyed the property; that despite the termination of the rights that plaintiffs and the additional parties defendant may have had in Lot 1, they nevertheless continued to use and claim the right to use said lot for purposes which were violative of defendants' rights to the sole and exclusive use thereof. Defendants prayed: (a) that the parties named be joined as additional parties and that process issue for them; (b) that plaintiffs and additional defendants be restrained and enjoined from trespassing on Lot 1; (c) that plaintiffs and additional defendants be enjoined from using Lot 1 as a means of access to the river front, and from using the lot as a picnic and playground, and for general relief. Plaintiffs filed a motion to strike portions of the counterclaim, and for a separate trial of the issues. The court

entered an order directing the clerk to issue "summons to said additional parties defendant upon further application of defendants". The court also sustained plaintiffs' motion for a separate hearing or trial, and "ordered that there be a separate trial upon the issues raised and the relief sought by plaintiffs' petition, and further separate trial upon the issues raised and the relief sought by defendants' second amended cross bill; that there be a separate judgment upon each such trial, and that each judgment shall, for purposes of execution thereon and appeal therefrom, be deemed final * * *".

The decree and judgment enjoined the defendants from using Lot 1 commercially for a boat harbor, the operation of docks for boats, the rental of boat dock space, the parking of automobiles both carriers and vehicles, and for picnic grounds.

█ The principle is firmly established that a covenant imposing valid restrictions upon lots within a given area creates an easement appurtenant thereto whereby the owner of each lot acquires an easement in each and all of the lots affected by the restrictions, McLaughlin v. Neiger, Mo.App., 286 S.W.2d 380, loc. cit. 383; State ex rel. Britton v. Mulloy, 332 Mo. 1107, 61 S.W.2d 741, loc. cit. 743; Matthews v. First Christian Church of St. Louis, 355 Mo. 627, 197 S.W.2d 617; Peters v. Buckner, 288 Mo. 618, 232 S.W. 1024, loc. cit. 1027, 17 A.L.R. 543; King v. St. Louis Union Trust Co., 226 Mo. 351, 126 S.W. 415; Thompson on Real Property (Perm. Ed.), Vol. 7, Sec. 3631, p. 121. As we stated in the McLaughlin case, supra, 286 S.W.2d loc. cit. 383: "Such a covenant has been classified as a negative easement, 'one the effect of which is not to authorize the doing of an act by the person entitled to the easement, but merely to preclude the owner of the land subject to the easement from the doing of an act which, if no easement existed, he would be entitled to do'. Wilson v. Owen, Mo.Sup., 261

S.W.2d 19, loc. cit. 24; Restatement of the Law, Property, Div. V, Sec. 452, p. 29."

Defendants are in accord with the foregoing principles and recognize that paragraph 3 of the indenture of restrictions prohibiting the use of any and all lots in the subdivision for commercial and business purposes, except Lots 69, 78, and 80, created a negative easement in all other lot owners. Seeking to overcome the restriction against commercial use the defendants advance several contentions. It is said that the restrictions as a whole disclose a clear intention on the part of Gross that Lot 1 was not subject to the negative easement for the benefit of the "lots" of the subdivision platted and laid out as a restricted area. More precisely, the defendants urge that by paragraph 9 all other lot owners were granted an affirmative easement in Lot 1 for the purposes therein specified, but that the affirmative easement thereby created in favor of other lot owners did not prevent Gross and wife from using the lot for any commercial purpose which was compatible with its use as a picnic and playground. And it is urged that the sale of the lot by Gross and wife freed it from the affirmative easement so that any subsequent owner of the fee could use Lot 1 for any and all commercial purposes.

We are not impressed with the urgency of defendants' contentions. By the explicit and unambiguous language of paragraph 3, no part of the subdivision can be used for "commercial, mercantile or business purposes" except Lots 69, 78, and 80. A cardinal rule of construction, here applicable, is embodied in the maxim, "expressio unis est exclusio alterius" (meaning that the express mention of one thing implies the exclusion of another). City of Hannibal v. Minor, Mo.App., 224 S.W.2d 598, loc. cit. 605. Since Lot 1 was excluded from the treatment accorded Lots 69, 78, and 80, it inevitably follows that paragraph 3, standing alone, constituted an in-

hibition against the use of Lot 1 for *any* commercial purpose.

■ Defendants also insist that the commercial use they have made of Lot 1 is authorized by the principle of law which permits the owner of property burdened with an easement to use his land in any way which is not inconsistent with the enjoyment of the easement by the owner thereof. Goddard on Easements (American Ed.), p. 280, cited with approval in State ex rel. Appel v. Hughes, 351 Mo. 488, 173 S.W.2d 45, loc. cit. 49; Campbell v. Kuhlmann, 39 Mo.App. 628; Thompson on Real Property, Vol. 1, § 326, p. 520; 28 C.J.S. Easements § 91, pp. 770, 771; 17 Am.Jur., Easements, § 96. In particular the defendants rely upon and emphasize State ex rel. Appel v. Hughes, supra, which not only reannounces the foregoing doctrine, but the rule that one cannot have an easement interest and own the fee title in the same land at the same time. While the latter principle has long been recognized by our courts, we fail to comprehend its applicability to the instant case. The effect of the indenture under consideration was not to grant Gross and wife an easement in Lot 1 during their ownership of the fee title thereto, as the majority opinion of this court improperly held was the result of the instrument in Gerber v. Appel, Mo.App., 164 S.W.2d 225, 226 (quashed in State ex rel. Appel v. Hughes, supra). Nor can we adopt the theory urged by defendants that the use that has been made of Lot 1 is consistent with the negative easement interest therein possessed by the owners of the servient estate (all other lot owners). To the contrary, it is our opinion that the inhibition against the use of Lot 1, as clearly provided by paragraph 3, for "commercial, mercantile or business purposes" was sufficient, in the absence of paragraph 9, to prevent Gross and wife and their assigns from conducting any commercial enterprise thereon, including the right to rent the lot by the day for picnic purposes. "The courts vigilantly guard a dominant

tenement in its full possession of an easement, and a servient one from an increase of the servitude, regardless of whether injury follows an abridgement of the easement or an enlargement of the servitude." Gerber v. Appel, Mo.App., 173 S.W.2d 90, loc. cit. 93. See, also, St. Louis Safe Deposit & Savings Bank v. Kennett Estate, 101 Mo.App. 370, loc. cit. 392, 74 S.W. 474.

■■ Thus it becomes apparent that if defendants are to prevail, they must do so by reason of the provisions of paragraph 9 of the instrument. The crucial question is: Did Gross and wife, by said paragraph, intend to place Lot 1 in the same category as Lots 69, 78, and 80? We must determine their intention from the language used, viewed in light of the entire context of the instrument, Kenwood Land Co. v. Hancock Inv. Co., 169 Mo.App. 715, 155 S.W. 861, 863; Andrews v. Metropolitan Bldg. Co., 349 Mo. 927, 163 S.W.2d 1024, loc. cit. 1028; the intent must be ascertained, not from one clause but from the four corners of the instrument, Andrews v. Metropolitan Bldg. Co., supra, 163 S.W.2d loc. cit. 1028.

Critical analysis and thorough consideration of the instrument in its entirety compels the conclusion that by paragraph 9 an exception was made to the restrictive covenant imposed by paragraph 3 against the use of Lot 1 for commercial purposes, to the extent that so long as Gross and his wife owned the lot, they were permitted to engage in limited commercial activities thereon, i. e., the right to rent by the day any part of Lot 1 to the public for picnic purposes. This reservation to the Grosses was subject to the affirmative easements granted other lot owners by the first and second sentences in paragraph 9. We cannot accept the contention that by said paragraph the Grosses intended to completely free Lot 1 from the restrictive covenant imposed by paragraph 3. Such theory is wholly inconsistent with paragraph 3. The special treatment given Lots 69, 78, and 80 by said paragraph conclusive-

ly and convincingly demonstrates that in laying out the subdivision and in executing the covenant of restrictions, the Grosses intended that only those three lots were to be used for any and all commercial purposes, subject, however, to their personal right to infringe upon the restriction imposed upon Lot 1 to the extent set out in paragraph 9. If it was intended that Lot 1 should occupy the same status as Lots 69, 78, and 80, it would have been a simple matter to have included it in the enumeration of the lots designated in paragraph 3, or to have so provided in other appropriate and clear language.

The argument is also advanced that because of certain physical aspects of Lot 1, it was never intended that it should be in the same category with the lots designed for residential purposes. Defendants point to the fact that the lot contains ten acres; it cannot be subdivided; the affirmative easement of access and for playground and picnic use is repugnant to its use for residential purpose; it has overflowed a number of times; that portion of Lot 1 subject to the United States Flowage Easement is not usable for residential purpose. We find no provision making it mandatory upon the owners of any or all the lots to construct dwellings thereon or to use the lots for that purpose. So the owner of Lot 1, while at liberty to do so, is under no compulsion to erect a dwelling thereon. Furthermore, the circumstances relied upon are wholly insufficient in our opinion to alter the restrictive covenant which, from what has been said, was obviously intended to apply to Lot 1.

■ In reaching the foregoing conclusion we are mindful that generally speaking, " * * * restrictions on the use of land are repugnant to trade and commerce, contrary to the well recognized business policy of the country, and in derogation of common law * * * ", and therefore are not favored, Dean v. Monteil, 361 Mo. 1204, 239 S.W.2d 337, loc. cit. 340. Mathews. Real Estate Co. v. National Printing

& Engraving Co., 330 Mo. 190, 48 S.W.2d 911, 81 A.L.R. 1039.

■ But restrictions against the use of land for business purposes have been generally upheld where the object was to create a wholesome residential district. The court recognized this rule in the Dean case, supra, and in Andrews v. Metropolitan Bldg. Co., supra, 349 Mo. 927, 163 S.W.2d 1024, loc. cit. 1030, 1031.

■ Defendants also make the point that the court erred in finding that the lot-owners' easement for access across Lot 1 had not expired. They urge us to hold that the affirmative easement for playground and picnic purposes, and of access to the river front, expired upon the sale of the lot by Gross and his wife. As previously observed, the distinguished trial judge ordered a separate trial of the issues raised by plaintiffs' petition for injunction and the answer thereto, and further ordered that the judgment entered thereon be final for purpose of appeal. This procedure was authorized by Supreme Court Rule 3.29,. 42 V.A.M.S. Engel Sheet Metal Equipment, Inc., v. Shewman, Mo.App., 301 S.W. 2d 856. Pursuant to this order the trial centered on the right of defendants to use Lot 1 for commercial purposes. The decree, by clear language, constituted "a separate judgment upon plaintiffs' cause of action * * * for the purposes of appeal * * * ". In view of this state of the record we will not undertake to adjudicate the issues presented by defendants' counterclaim. It is noted, however, that in the "final decree on plaintiffs' petition", the court made findings of facts. In paragraph 8 the court found, "That the title to Lot 1 no longer remains in Charles G. Gross and Mildred Gross his wife, and under the provisions of clause 9 of the restrictions and Covenants no right exists in plaintiffs to now use Lot 1 as a playground and picnic ground;" * * * "That the second part of said clause numbered 9 granting owners of other lots in the subdivision the right at all times to go over and across

Lot 1 as a means of access to the river front, remains in effect and grants plaintiffs an easement which still prevails."

We are of the opinion that inasmuch as the court's finding in respect to the use of Lot 1 by the other lot owners is beyond the issues litigated, it should be stricken from the judgment appealed from. The judgment is therefore modified by striking that portion of paragraph 8 thereof which we have quoted.

As modified the judgment is affirmed.

RUDDY, P. J., and ANDERSON, J., concur.