John J. BUONCRISTIANI et al.,
Plaintiffs-Appellants,

v.

Leslie R. RANDALL et al.,
Defendants-Respondents.

No. 35942.

Missouri Court of Appeals,
St. Louis District,
Division One.

July 8, 1975.

James E. Godfrey, Inc., Samuel T. Vandover, St. Louis, for plaintiffs-appellants.

Vincent S. Moody, Clayton, for defendants-respondents.

RENDLEN, Judge.

Plaintiffs below bring this appeal from denial of their prayer asking injunctive relief for alleged violations of restrictive covenants in the Kar-Lin Estates Subdivision of St. Louis County. Suit was brought in three counts [1] but plaintiffs appeal only as to Count I, charging defendants with erection of a fence in contravention of Part C-2 of the subdivision indenture and seeking removal of offending portions of the fence.

Our review is *de novo*, giving deference to the trial court's findings in matters involving the credibility of witnesses but reaching our own conclusions as to both facts and law. *Minton v. Lichtenstein,* 487 S.W.2d 43, 46[1] (Mo.App.1972).

The parties are neighbors in Kar-Lin Estates. The Buoncristianis' house faces north on Zermatt Court, an east-west street. The Randalls, adjacent neighbors on the east, occupy a house on the corner of Zermatt Court and Cordes Drive; their house, facing east, fronts on Cordes Drive, a north-south street. Both parcels came to the present owners by direct or mense conveyance from the original common grantor, George Karr, Jr., developer of Kar-Lin Estates.

1. Counts II and III, charging defendants with subdivision indenture violations by building a swimming pool and parking a house trailer on their land, were ruled against plaintiffs and no appeal is taken from that action of the trial court.

When developing the subdivision Karr executed a document entitled "Restriction Indenture", applicable to all lots in the subdivision, running with the land whether or not embodied in subsequent conveyances. Its purpose was to make "said subdivision desirable as residential property." Since resolution of this case turns on interpretation and application of the indenture, we set out its relevant portions.

" * * *

## PART C.

### RESIDENTIAL AREA COVENANTS

* * * * * *

C-2. No building shall be erected, placed or altered on any lot until the construction plans and specifications and a plan showing the location of the structure have been approved by the architectural control committee . . . *No fence or wall shall be erected, placed or altered on any lot nearer to any street than the rear line of the building unless similarly approved . . .*

* * * * * *

## PART D.

### ARCHITECTURAL CONTROL COMMITTEE

D-1. The architectural control committee is composed of George C. Karr, Jr., . . . Lucille L. Karr, . . . and Katherine Harness, . . . A majority of the committee may designate a representative to act for it. In the event of death or resignation of any member of the committee, the remaining members of the committee shall have full authority to designate a successor. Neither the members of the committee, nor its designated representative shall be entitled to any compensation for services performed pursuant to this covenant.

D-2. The committee's approval or disapproval as required in these covenants shall be in writing. In the event the committee, or its designated representative, *fails to approve or disapprove* within 30 days after plans and specifications have been submitted to it, *or in any event, if not [sic] suit to enjoin the construction has been commenced prior to the completion thereof, approval will not be required and the related covenants shall be deemed to have been fully complied with.*

## PART E.

### GENERAL PROVISIONS

E-1. These covenants are to run with the land and shall be binding on all parties and all persons claiming under them . . .

E-2. Enforcement shall be by proceedings at law or in equity against any person or persons violating or attempting to violate any covenant either to restrain violation or to recover damages. (All emphasis added.)

* * * "

The Buoncristianis purchased their home in 1963, the Randalls in 1969. In 1963 Buoncristianis installed a chain link fence running easterly along their *rear building line* to the east line of their property, which is Randalls' west property line, thence south to the back line of plaintiffs' land. On February 21, 1972, Mrs. Buoncristiani observed a representative of a fencing company at the Randalls and that afternoon telephoned Mrs. Randall asking if she were aware of the indenture restrictions concerning fences, to which Mrs. Randall replied in the negative. On March 13 poles for chain link fencing were installed on defendants' property. The next day Mrs. Buoncristiani sent a telegram to the Randalls advising of the apparent indenture violation and requesting they cease further installations, and mailed them a copy of the indenture. On March 15 chain link was attached to the poles and the fence completed.

Following is a drawing showing the lots, house locations and fences. The dotted line represents the Randall fence and the crossed line that of the Buoncristianis.[2]

Mrs. Randall testified she had been unaware of the indenture restrictions prior to her conversation with Mrs. Buoncristiani on February 21, but on that day contacted Mr. Karr, a named member of the architectural control committee, and presented him a sketch of the planned fence. Karr informed her that since completion of the subdivision he was no longer acting as trustee and would not rule the fence question. The committee never issued their *approval* or *disapproval* of the proposed fence. Four months after its completion Karr sent a letter to Mssrs. Komorowski and Reeves, other subdivision residents, announcing his resignation from the architectural control committee and appointing them to fill the committee vacancies.[3]

Defendants admit their fence in part extends toward the front of their lot beyond the rear building line and also admit their familiarity with Part C–2 of the restrictions. However, they contend that failure of the architectural control committee to *approve* or *disapprove* the planned fence and failure of plaintiffs to institute suit prior to completion of the fence results in the covenants having been deemed complied with under Parts D–1 and D–2 of the indenture.

Covenants of the type found here are classified as negative easements precluding servient owners from certain use of the land to which they would otherwise be entitled. Such covenants are property rights running with the land. *Tracy v. Klausmeyer,* 305 S.W.2d 84, 88[1, 2] (Mo. App.1957); *Cook v. Tide Water Associated Oil Co.,* 281 S.W.2d 415, 418 (Mo.App.1955).

2. This illustration is taken from plaintiffs' Exhibit R, a schematic drawing, and additional photographic exhibits.

3. Two other named committee members had resigned earlier. In their brief on appeal plaintiffs do not raise the issue of whether the architectural control committee was in fact in existence and operating at the time defendants submitted their plans and it is therefore unnecessary for us to rule that question.

Plaintiffs, as subdivision owners, have standing to seek enforcement of such covenants since they have an equitable interest in the easement burdening defendants' property. *State ex rel. Britton v. Mulloy,* 332 Mo. 1107, 61 S.W.2d 741, 743[1–3] (1933); *Hisey v. Eastminster Presbyterian Church,* 130 Mo.App. 566, 109 S.W. 60, 62[2] (1908).

■ "[I]n construing restrictive covenants, the intent of the grantor-covenantor is controlling and is to be ascertained from the language used, viewed in light of the entire context of the instrument . . . restrictive covenants are to be strictly construed, are not to be extended by implication to include anything not clearly expressed in them. If there is substantial doubt of their meaning, such doubt should be resolved in favor of the free use of the property." *Pellegrini v. Fournie,* 501 S.W.2d 564, 565[1, 2] (Mo.App.1973). But " '(t)he principle that restrictions as to the use of real estate should be strictly construed and doubts resolved in favor of the free use of property should never be applied in such a way as to defeat the plain and obvious purpose of the restriction.' " *Greenberg v. Koslow,* 475 S.W.2d 434, 436[2, 3] (Mo.App.1971).

The indenture provision C–2, in pertinent part, states: "No fence or wall shall be erected, placed or altered on any lot nearer to any street than the rear line of the building unless similarly approved." It appears, as plaintiffs claim, that those portions of defendants' fence standing east of line C–D and E–F were constructed in violation of the above-quoted provision as they are nearer Cordes Drive than the rear line of Randalls' home.

■ Plaintiffs also urge that those portions of the fence lying north of line D–H are in violation of the "rear building line" restriction relative to Zermatt Court. We do not agree. Webster defines "rear" to be the opposite of "front". The rear line of the building is thus the one opposite the front line of the building and not the line

intersecting the front building line and running as its side building line. See *Margolis v. Wilson Oil Corp.,* 342 Mich. 600, 70 N.W.2d 811, 813[4] (1955). Other jurisdictions have ruled that the fact a lot is on a corner does not cause it to have two fronts, one on each street, *Turney v. Shriver,* 269 Ill. 164, 109 N.E. 708, 709[1] (1915), and that "front property line" restrictions do not apply to a side street adjacent to a corner lot fronting on an intersecting street. Where a lot is a corner lot and it is doubtful if the restriction applies to a cross street, it will not be enforced as to such street. See 26 C.J.S. Deeds § 164(2), pp. 1113–1114, quoted in *Maher v. Park Homes, Inc.,* 258 Iowa 1291, 142 N.W.2d 430, 434[6] (1966). Similarly, *Staley v. Mears,* 13 Ill.App.2d 451, 142 N.E.2d 835, 837[2] (1957), holds: "While it is true that a corner lot, . . . in a certain sense, front[s] on both streets, still, in the strict sense of that term, that portion of the lot, only, which is opposite the rear and faces upon the street, is properly designated as the front of such lot." Conversely, that line opposite the front of the Randall house is the rear building line. Those portions of the fence located north of line D–H are not in violation of the restriction because of their proximity to Zermatt Court as related to the "rear building line" of the Randall home.

■ As previously indicated, those portions of the fence located east of lines C–D and E–F were originally in violation of the indenture provisions because of their positions in front of the rear building line of the Randall home; however, we hold that plaintiffs' right of enforcement is vitiated by the inaction of the architectural control committee. The committee never issued approval or disapproval of the proposed fence nor filed a suit to enjoin construction. Part D–2 provides that if the architectural control committee "fails to approve or disapprove within 30 days after plans and specifications have been submitted to it," affirmative approval is not required and the related covenants are "deemed to have been

 

fully complied with." It also contains a requirement that suit to enjoin must be brought prior to completion of construction or the restrictions are waived and the related covenant deemed to have been fully complied with.

Since defendants did not wait 30 days to ·commence construction but instead built the fence during the 22nd to 24th days following submission of the fence plans, it could be argued that the thirty-day requirement was thus extended to April 14 (30 days beyond March 15, the completion date of the fence) for committee approval or disapproval. This offers plaintiffs little comfort since no action approving or disapproving the application was forthcoming during that period or any time thereafter. It could also be argued the time limitation (completion date of the fence) for filing suit by the committee should also be extended for the same reason; yet the fence was completed March 15, and if we extend the terms of the indenture by adding the 30 days following the completion of the fence, it avails plaintiffs nothing since suit was never brought by the committee.

The trial court, ruling for defendants, based its decision on the failure of plaintiffs to file *their* action prior to the completion of the fence. As shown above, we reach the same result for different reasons. It is not necessary to rule whether plaintiffs were required to bring suit prior to the completion of the fence since the provisions of the indenture were waived or nullified by the inaction of the architectural control committee. When the Randalls purchased their land they were charged with knowledge of the duly recorded fence restrictions of the indenture; similarly, the Buoncristianis were charged with knowledge of the extremely loose, even flimsy, provision for enforcement and waiver.

The fence is now deemed in compliance and plaintiffs' claim denied. We now better understand the melancholy irony of the poet's words, "Good fences make good neighbors." [4]

Judgment affirmed.

WEIER, P. J., and DOWD, J., concur.

4. *Mending Wall* by Robert Frost.