DELTA REALTY COMPANY, Appellant, v. LEE HUNTER.—152 S. W. (2d) 45.

Division Two, June 10, 1941.

*Hal H. McHaney* for appellant.

1110

*Merrill Spitler* for respondent.

COOLEY, C.—Plaintiff, a corporation, filed this suit in the Circuit Court of New Madrid County, April 7, 1937, to determine title to

land in that county, viz., Section 7, Township 23, Range 13 East. Plaintiff was in possession. Defendant, by his amended answer denied plaintiff's ownership, and by what is denominated "further answer and cross bill," (generally called cross-bill in the record and briefs) claimed ownership in himself, alleged the source of his title, the title by which plaintiff claimed, asked determination of the title and further pleaded a cause of action in ejectment. Plaintiff filed a reply denying the affirmative allegations of defendant's cross-bill, except as to the source of plaintiff's title, pleading acts of estoppel as against defendant, and averring that if its title was not good it was entitled to reimbursement for improvements made on the land. Defendant joined issue with this reply by what is denominated a replication. The case was tried to the court as one in equity. The court found and adjudged that defendant was the owner of the land and allowed plaintiff for improvements after deducting a named amount for rent and waste. Plaintiff appealed.

The pleadings are long. We shall summarize them, using the nomenclature the parties used.

The petition is somewhat broader than the usual formal petition to determine title. It asks the court to determine and adjudge the estate title and interest of the parties, whether legal or equitable, certain or uncertain, present or reversionary and to "finally determine all the rights, claims, interests, liens and demands whatsoever" of the parties or either of them.

Defendant's cross-bill alleges that he acquired the title by quitclaim deed from Frances Smith, dated June 3, 1930, recorded December 13, 1935; that the plaintiff claimed title by virtue of a sheriff's tax deed executed September 13, 1935, pursuant to execution and sale under a judgment of the New Madrid County Circuit Court rendered March 4th, 1935, against Frances Smith for delinquent taxes, but that no *valid* judgment was rendered for that the circuit court was without jurisdiction because the only service of process on Smith was by an order of publication based upon a premature *non est* return of summons issued for him. Wherefore it is claimed the tax judgment, execution and deed were void. In that part of the cross-bill defendant offers to refund any taxes paid by plaintiff on the land, and asks cancellation of the tax deed as a cloud on his title and that the court ascertain and adjudge the rights, title and interest of the parties "and for general relief." The remainder of the cross-bill is in the form of an action in ejectment in which defendant prays for possession and lays his damages for plaintiff's alleged unlawful withholding of possession at $12,000 and alleges the value of monthly rents and profits to be $500.

Plaintiff's reply admitted that plaintiff purchased at the tax sale, receiving the sheriff's deed, and claiming thereunder; that the tax suit was instituted March 25, 1933, Frances Smith being then the record

owner of the land; that prior thereto defendant Hunter had owned it and on January 8, 1930, had conveyed it by warranty deed to Smith, without consideration, for the purpose of avoiding payment of taxes and to avoid being known as a defendant in suits for taxes then delinquent; that on January 30, 1930, Smith reconveyed the land to Hunter, without consideration, that deed being withheld from record till December 13, 1935; that defendant was the real owner of the land at all times mentioned; that he knew the general State and county taxes were delinquent, as well as certain drainage taxes; that he knew Smith's whereabouts and knew that no one else in New Madrid County had such knowledge; that defendant's purpose in deeding the land to Smith and taking back a deed from Smith was to have the land bid in for him at less than the general taxes due and to cut out the drainage tax, the lien of which was inferior to that of the State; that plaintiff did not know, when bidding at the tax sale, the residence or whereabouts of Smith, and bought in good faith, its bid being $1000; that after satisfying the judgment and costs there remained in the sheriff's hands a surplus of $117.45 which defendant demanded; that the land, when sold at the tax sale, was uncleared except for about thirty acres partially cleared and was of small value, "practically worthless in its then condition."

The reply then sets forth at length the improvements made and clearing done by plaintiff, and pleads acts and conduct of defendant alleged to constitute estoppel which will be considered in discussing the evidence. Of the "replication" it is sufficient to say that it sufficiently counters the affirmative allegations of the reply. The pleadings sufficiently presented the issues tried.

The court found and adjudged for defendant, as we have said, on the issue of title and awarded plaintiff for improvements as follows: $5066.58 for "buildings, and repairs to buildings, including pumps and fences;" $600 for roads; $250 for bridges; and $7770 for clearing; aggregating $13,686.58. The court also awarded plaintiff judgment for the $1000 purchase money paid by it at the tax sale with $158.50 interest thereon, making the total amount due plaintiff $14,844.08. From that sum the court deducated $3250 allowed defendant for rents and profits since the filing of defendant's answer and for "waste and injury to the premises" (all in a lump sum, not itemized); and gave plaintiff judgment for the net balance, $11,594.08, with a lien on the land for its payment. The decree fixed a time for payment and provided that if said sum was not paid within that time defendant's interest in the land should cease and plaintiff should thereupon be vested with the fee simple title. [In the above figures we have given the totals as they appear in the abstract We think there is an error of $1 in the computations but it has not been noticed by the parties and need not be noticed by us. We mention it merely for sake of accuracy.]

In due time defendant, in open court, tendered plaintiff U. S. Federal notes aggregating the amount awarded, which tender was refused. No point is made that the tender was not of money, or was in anywise insufficient. Such further facts as may be deemed necessary will be given in the course of the opinion.

Plaintiff's main contentions on this appeal are that its record title is good and that the court erred in decreeing the title to be in defendant; that in any event defendant is estopped to dispute plaintiff's title and ownership; and that if defendant was properly adjudged to be the owner of the land the allowance made by the court for clearing the land and putting it in cultivation was inadequate, under the evidence. No complaint of the award for improvements is made by either party so far as concerns the allowance for buildings, repairs to buildings, pumps and fences, roads and bridges. Plaintiff also contends that the allowance to defendant for rents, etc., was excessive, under the evidence, if he was entitled to recover therefor at all.

We take first the question of record title. It was admitted that "Frances Smith" was the "common source of title." The name "Frances" is generally understood to be that of a woman, the similarly pronounced name of a man being spelled "Francis." In this case it was shown and apparently treated as a conceded fact that the Smith to whom defendant deeded the land in 1930 was a man, the same person who reconveyed by quitclaim deed to defendant, and that the spelling "Frances" in defendant's deed to Smith as it appeared of record was an incorrect spelling of the name. No point is made as to this misspelling or the use of the name "Frances" when it should have been "Francis." We mention it to explain the use of the name "Frances" in proceedings to be presently noted.

Plaintiff introduced in evidence the sheriff's tax deed to it and the notice of sale and rested its case in chief. The notice and deed appear regular on the face. The deed contains the usual recitals of such instruments. It made a prima facie showing of title in plaintiff.

Defendant introduced records and files in the tax suit. The petition named as defendants "Frances Smith and ———— Smith her husband, Little River Drainage District, a corporation, and Drainage District No. 19 of New Madrid County, Missouri, a corporation," and the suit was for delinquent State and county taxes for 1928 to 1931, inclusive. Defendant then introduced the summons issued by the circuit clerk which the abstract of record says was dated April 10, 1933, returnable to the next term of court, to be begun and held on the third Monday of the succeeding May, commanding the sheriff to summon "Frances Smith and blank Smith her husband" and Drainage District No. 19, and also introduced the sheriff's return thereon. The summons apparently was not fully read into the record and is not copied in the abstract. The return was appar-

ently read into the record by defendant's counsel. It appears from the abstract that in connection with his offer of the summons counsel also offered the sheriff's return thereon which he stated "is as follows:"

" 'Executed the within writ, at the County of New Madrid and State of Missouri, on the *14th day of April, 1933,* (italics ours), by delivering a copy of petition and summons there furnished by the Clerk of the Circuit Court of New Madrid County, Missouri, to R. R. Jones, for Drainage District No. 19 of New Madrid County, Missouri, a corporation, he being first served, at the County of New Madrid and State of Missouri. I further executed this writ by making a diligent search and failed to find Frances Smith and blank Smith, her husband, in the County of New Madrid. Signed J. S. Harris, Sheriff of New Madrid County, Missouri, by George Smart, Deputy Sheriff.'

"Which summons shows in the upper left hand corner a notation in ink, 4-14-33."

The court made an order of publication based upon said *non est* return as to Smith notifying "Frances Smith and ——— Smith her husband" of the pendency of the suit and directing said named party (or parties) to appear at the next term, to be begun and held on the third Monday of January, 1935. The order of publication is set out and appears regular on its face. It was duly published. It was issued as shown by the abstract on May 3, 1934, during the May, 1934, term of court. [There is no explanation of why the order of publication was not made until the May term of court, *1934,* but no point is made in regard to this apparent delay.]

It is evident that in the sheriff's return the words "Frances Smith and blank Smith her husband," as quoted above, read "Frances Smith and ——— Smith her husband" and that counsel in reading it read the "——— Smith" as "blank Smith."

Plaintiff's counsel in his printed argument here sets out what he there says is a copy of the return. As thus set out the return is divided into two paragraphs, the second paragraph beginning with the words "I further executed this writ," etc. Defendant in his brief says the return was in one paragraph, as shown in the abstract. We must look to the abstract.

The anxious question as to the validity of plaintiff's record title turns upon whether or not the sheriff's return was made prematurely. If it was, the order of publication based thereon was invalid, as were the tax judgment and sheriff's deed, since Smith made no appearance in the tax suit and the tax judgment was by default. [Cummings v. Brown, 181 Mo. 711, 81 S. W. 158; Himmelberger-Harrison Lumber Co. v. McCabe et al., 220 Mo. 154, 119 S. W. 357 (which for convenience we shall call the Lumber Company case).]

In the case before us there was no filing mark or notation on the sheriff's return, nor any notation on the record to indicate when

the return was filed in the clerk's office. No evidence was offered as to when the return was made or filed. The return was not dated, except for the date April 14, 1933, appearing in the body thereof. A similar situation was presented in the Cummings and Lumber Company cases, supra. In this case it is not shown when or by whom the figures "4-14-33" in the upper left hand corner of the return, or summons, as the abstract says, were made—probably by the officers who executed the writ.

In the Cummings case the sheriff's return read:

" 'Executed the within writ in Greene county, Missouri, on the twenty-second day of June, 1899, but after making search and enquiry am unable to find the within named defendant, Walter L. Wilson, in Greene county, Mo.' "

The writ was returnable to a term of court beginning later. In the Lumber Company case the return was in substantially the same language. The writ, as in the Cummings case, was returnable to a term beginning after the date named in the return. In both cases it was held that the return showed on its face that it was premature. In both cases it was pointed out that unless the sheriff sooner obtains personal service of the writ it was his duty to retain it until the return day and to continue to use reasonable diligence to obtain service during the life of the writ. In the Cummings case the appellant contended that since there was no memorandum of the clerk showing when the return was filed in his office the court should presume that the sheriff did his duty and kept it in his possession seeking to execute it until the return day. The court said:

"We do not think the sheriff is entitled to that presumption in the face of his return, which indicates that he had done with it all that he intended to do on June 22nd. The return was not sufficient to show that the sheriff had done his duty in reference to the writ."

The same contention was made in the Lumber Company case and was denied, the court citing with approval and quoting from the Cummings case on that proposition. In the Lumber Company case the court said, 220 Mo. 1. c. 177:

". . . in the interpretation of the law applicable to the statutes concerning constructive notice to defendants, we must not be unmindful of the uniform expressions by this court that, where a plaintiff seeks to confer upon the court jurisdiction of the person of the defendant by constructive service, there must be a strict compliance with the terms of the statute under which the order of publication purports to have been issued."

In Eminence Land & Mining Co. v. Current River Land & Cattle Co., 187 Mo. 420, 1. c. 435, 86 S. W. 145, it is said that "When the law is driven, from the necessity of the case, to authorize a judgment that will affect the property rights of an absent or unknown defendant, on a notice by mere publication in a newspaper, it demands . . .

a strict compliance with the terms of the statute under which the publication purports to have been made." The rule is well established.

In the Lumber Company case the court held, again citing with approval the Cummings case; that the order of publication was invalid and did not give the court jurisdiction of the person of the defendant in the tax suit If those decisions are to be followed the order of publication, tax judgment and tax deed in the instant case must be held invalid, unless, as plaintiff contends, this case is distinguishable from the Cummings and Lumber Company cases.

Plaintiff argues that the return was written in two paragraphs, as set out in its brief, raising an inference that such two paragraphs were written at different times or at least that the officer retained the writ until the return day before writing the second paragraph (or perhaps any portion of the return). We cannot concede this contention because, if for no other reason, we must look to the abstract of record, wherein the return appears as in one paragraph, evidently, we think, written all at one time.

Plaintiff further argues that since there was no file mark on the return or memorandum of the clerk showing when the return was filed we should presume the sheriff did his duty and retained it until the return day. Plaintiff cites 50 C. J., p. 571, sec. 281, stating in substance that a general presumption is ordinarily indulged, in aid of an officer's return of process which is regular on its face, that the officer has done his duty in the premises, "unless the contrary appears." Under the quoted phrase the text cites two cases, the Cummings and Lumber Company cases, supra. Plaintiff also cites Missouri decisions in which such presumption was allowed in favor of an officer, among which may be mentioned: Wells v. Wells, 279 Mo. 57, 213 S. W. 830; Elrod v. Carroll (Mo.), 202 S. W. 4; Griffin v. Franklin, 224 Mo. 667, 123 S. W. 1092. We have examined those cases and the other Missouri cases cited. None of them involved a situation such as we have here and we do not regard them as supporting plaintiff's contention under the facts of this case. We shall not take space to analyze them.

Further, on this question of presumption of performance of duty by an officer it may not be amiss to call attention to our statute, Sec. 884, R. S. 1939, Sec. 732, R. S. 1929, Mo. Stat. Ann., p: 953, which provides:

"Every officer to whom any writ shall be delivered to be executed shall make return thereof in writing of the time, place and manner of service of such writ, and shall sign his name to such return." .

Note, the statute says the officer shall state in his return the *time, place and manner* of the service. So far as the matter might be thought to rest upon presumption, if we are to indulge the general presumption of performance of duty by an officer must we not also presume that the sheriff obeyed the explicit statutory command? He named but one *time* in his return, stating that he "executed the

within writ'' (not that he partly executed it) on April 14, 1933. We think, as was held in the Cummings case, his return must be considered as indicating that on the date named in his return he had done with the writ all he intended to do.

Plaintiff further argues that this case is distinguishable from the Cummings and Lumber Company cases, supra, in that in each of the latter there was but one defendant while here there were two defendants named in the summons, and, as we understand the argument, that the date given in the return was intended to refer only to the date of *service* on the defendant first served, leaving no named date as to the attempted service on Smith, and that therefore it should be presumed that the sheriff retained the writ, as it was his duty to do, until the return day before making a return showing inability to serve Smith. For reasons which we think are sufficiently indicated above we do not believe this contention can be allowed.

Our conclusion on this branch of the case is that the order of publication was invalid and that the tax judgment and the tax deed were therefore invalid and did not pass title to plaintiff.

## *Of Estoppel.*

In Keeney v. McVoy, 206 Mo. 42, 58, 103 S. W. 946, Lamm, J., speaking for the Court en Banc, quoted the elements of estoppel *in pais* stated in Bigelow on Estoppel (5 Ed.), p. 570, as follows:

'' 'First. There must have been a false representation or a concealment of material facts. Second. The representation must have been made with knowledge, actual or virtual, of the facts. Third. The party to whom it was made must have been ignorant, actually and permissibly, of the truth of the matter. Fourth. It must have been made with the intention, actual or virtual, that the other party should act upon it. Fifth. The other party must have been induced to act upon it.' ''

In Pollard v. Ward, 289 Mo. 275, 233 S. W. 14, 17 [3], it is said there must be ''First, an admission, statement, or act inconsistent with the claim afterwards asserted and sued on; second action by the other party on the faith of such admission, statement, or act; and, third, injury to such other party, resulting from allowing the first party to contradict or repudiate such admission, statement, or act.''

In De Lashmutt v. Teetor, 261 Mo. 412, 442, 169 S. W. 34, the court, quoting from Harrison v. McReynolds, 183 Mo. 533, 549, 82 S. W. 120 said: ''But there is no such thing as estoppel *in pais* for neglecting to speak or act when the party did not know the facts which if known would have made it his duty to speak or act.'' In the Harrison case the court applied the principle to a case of ignorance of her legal rights on the part of one against whom estoppel was alleged, as stated in the De Lashmutt case, 261 Mo. l. c. 442, 169 S. W. 34.

With these principles in mind we proceed to consideration of plaintiff's claim of estoppel.

Plaintiff stresses defendant's conduct in transferring the record title to Smith. Defendant, testifying for himself, said that he did that because he did not want a tax suit brought "against his name." He virtually admitted that he had in mind cutting out the special drainage taxes. He said that "maybe" he desired the land sold for general taxes (which he knew were delinquent) in order to eliminate the special taxes, "that he didn't deny it;" that he made the conveyance to Smith to evade the special taxes "trusting to luck;" that everybody "in this country" was doing that sort of thing. He also testified that at the same time his warranty deed was delivered to Smith the latter executed and delivered to him the quitclaim deed. It is clear that both deeds were without actual consideration.

Whatever may be thought of defendant's conduct and purpose in that transaction plaintiff knew nothing of it and it could not have been an inducing factor in causing plaintiff to buy at the tax sale.

Plaintiff's evidence did not show that defendant had any knowledge or information of the tax proceedings prior to the sale nor that his resident agent, Mr. Buesching, had any such knowledge or information. Defendant (who we infer from the abstract did not reside in New Madrid County), testified that he knew nothing of the tax suit and sale until about July 6, 1936, when a friend told him the land had been sold to someone and there was a surplus in the sheriff's hands. His written request to the sheriff for that surplus was dated July 7, 1936.

Buesching (called as a witness by plaintiff), testified he was defendant's secretary "in the abstract business" but that it was not part of his duties to keep track of tax sales; that defendant looked after the payment of his taxes; and that he, Buesching, knew nothing of the tax proceedings and sale until long after the sale. Neither defendant nor Buesching nor any one for either of them attended the sale.

Plaintiff's evidence failed to show that knowledge or information was brought home to defendant that plaintiff was clearing and improving the land prior to the filing of defendant's answer and cross-bill herein. C. B. Baker, plaintiff's president and chief stockholder, —the only member or officer of plaintiff corporation to testify, and who had bid in the land for plaintiff—said that when he bought there were a few tenants of defendant on the land, who surrendered possession with defendant's consent, but we think it clear from his whole testimony it was merely his conclusion that said tenants moved off with defendant's knowledge and consent. They did move off when plaintiff demanded possession immediately after its purchase. On this point defendant testified those tenants were mere "squatters" to whom he had rented small portions of about thirty acres in all

and agreed to give them two year's crops for clearing, and he knew nothing about when or why they moved off.

Baker testified that W. S. Edwards, an abstracter, told him of the surplus money in the sheriff's hands and of defendant's request (demand, he called it) for same and that he, Edwards, thought such demand removed all doubt as to the title so far as defendant was concerned; that he, Baker, "doubted" if he would have gone ahead but for said advice from Edwards, but that he did not go ahead wholly upon such advice. In this connection it may be stated he had already begun his improvements and development work early in 1936, before said request of defendant to the sheriff was made. Edwards did not represent or purport to act for defendant and defendant knew nothing of Edwards' advice to Baker. Edwards' statements to Baker can have no binding effect on defendant.

Defendant testified he did not know when plaintiff went into possession; that "Mr. Lafton told him when he first found out that the Delta Realty Company was in possession" on July 6, 1936. It is not clear whether "he" referred to Lafton or defendant, the abstract stating it in narrative form. Later in his testimony defendant said "they" told him "somebody" was in possession but he did not know it was the plaintiff until about the time his answer herein was filed and testified that he did not know plaintiff was improving the land until about when he filed his answer.

Defendant further testified that when he, by his agent Buesching, made the written request to the sheriff for the surplus money he did not know there had not been legal notice to Smith in the tax suit and supposed the sale had been legal; that later he sent up and got the papers and discovered that there had not been legal service on Smith and informed his attorney of the "defects," the attorney confirming his opinion. The record does not show when defendant discovered said defects.

Mr. Harris, plaintiff's witness, who was sheriff when the sale was made, testified to receiving defendant's request for said surplus money and that he at first declined to pay it to defendant's agent, Buesching, not knowing to whom it should be paid, but that later, he did not say when, after consulting his legal adviser, he tendered the money to Buesching, who refused to accept it. Buesching denied that such tender was made to him.

In this connection plaintiff contends that defendant's request for said surplus money amounted to ratification of the sale, saying in its brief that "had defendant received the proceeds from the sale as demanded" it would have constituted ratification of the sale and estopped him from thereafter asserting title to the lands. Plaintiff cites cases which would sustain that contention if defendant had received said proceeds with knowledge of all the material facts. But defendant did not receive the proceeds or any part thereof and it

cannot be held under the evidence that when he made request for the surplus in the sheriff's hands he knew the order of publication on which the tax judgment was founded was invalid. He had constructive notice of the contents of the tax deed, it being of record, but it was fair on its face and prima facie passed the title. No case has been cited and we know of none holding that there can be ratification or estoppel without knowledge, actual or imputed, of the material facts on the part of the person claimed to have ratified or to be estopped. In Miles v. Popp et al. (Mo.), 192 S. W. 424, the plaintiff, suing to cancel a trustee's deed made pursuant to sale under a deed of trust, had received the proceeds of the sale, but in ignorance of facts invalidating the sale. He was held not to be estopped. And see for discussion of this proposition Grafeman Dairy Co. v. Northwestern Bank, 290 Mo. 311, 235 S. W. 435, 443[8]. The fact, stressed by plaintiff, that defendant's written request to the sheriff was not formally withdrawn can be of no avail. The sheriff at first declined to pay over the money. When he later tendered it, if he did so (a disputed question) the tender was refused. It cannot be deemed that the request was any longer in force.

Plaintiff further contends that defendant's act in making said request of the sheriff was analogous to bidding at a tax sale by an owner whose land is being sold, citing Spence v. Renfro, 179 Mo. 417, 78 S. W. 597. In that case the defendant, Renfro, had bought at a tax sale land of which Spence was record owner at the time of the tax suit. Spence had not been made a party to the tax suit. He attended the tax sale and was an active bidder, being the next highest bidder to Renfro, but he gave no intimation at the sale that he owned or claimed an interest in the land. After the sale he sued to cancel the sheriff's tax deed to Renfro. This court held that he was estopped from asserting title; that the evidence clearly showed that Renfro was misled and was induced to bid on and buy the land by reason of Spence's entering into the competition and bidding on it and that "to now permit plaintiff to assert title . . . would be a fraud upon defendant which the law will not permit." The court further said "By concurring in the sale by participating in it he made it his own act." On this point there is no analogy between the Spence case and the case at bar.

We have given full consideration to plaintiff's contentions on the question of estoppel and are of the opinion that they cannot be sustained.

### Of Clearing and of Rents and Waste.

Plaintiff cleared 518 acres, 239 acres by "day labor" which it employed and 279 acres "by contract," which we understand from the record means the persons doing the clearing got one or two years' crops for clearing. Plaintiff claims, and it introduced evidence tend-

ing to show, that such clearing enhanced the value of the land by $10,360, or $20 per acre. The court allowed $7770 or $15 per acre. Plaintiff contends the allowance made was inadequate under the evidence. The evidence on this issue was oral and was conflicting. Numerous witnesses were called. Baker estimated that the clearing enhanced the value of the land $20 per acre. His witness, Tilghmon, said he thought it was "worth" $20 per acre, presumably meaning it increased the value that much. Plaintiff's witness, Barton, testified he thought the "improvements," evidently meaning all the improvements, enhanced the value of the land $40 per acre. Witness Streetor thought the "improvements" (evidently as a whole) increased the value of the land $45 per acre. Defendant's witness, Taylor, thought that "at the present time" (time of trial) the clearing would be "worth" $15 to $20 per acre. It is not clear whether he meant it would cost that much or add that much to the value of the land. Witness Barnes was asked what he would consider a fair price that he would charge for doing the clearing and said he "figured" $15 or $20 per acre would be a fair price. Witness Rule said he would not undertake "to do that clearing today" for less than $20 per acre. He had not had much experience in clearing. Witness Standlin said he would not undertake it for less than $22 or $23 per acre but that he did not know "the prices charged for clearing land at the present time." Tom Allen, who had had large experience in clearing land, testified that the clearing added practically nothing to the value of the land, owing to the way the land was cleared and the condition in which it was left and that it would require a good deal of money "to get it in shape," giving his reasons for so thinking. There was other testimony tending to show that the clearing added less than $20 per acre to the value of the land.

Baker admitted that not all of the trees were removed. Those left standing were "poisoned," which we gather means deadened. There was evidence to the effect that trees over ten inches in diameter were poisoned and left standing and that in numerous places there was a large number of such trees; that a poisoned tree was not thereafter good for lumber because worms would get into it; that if the trees were cut down it would require much labor and expense to "work up" and remove the tops and if left to fall they would have to be removed. There was also evidence tending to show that there was a considerable amount of merchantable timber on the land, Allen thought enough to offset the value of the improvements.

In 1936 Victor Martin, with plaintiff's permission, set up a sawmill on this land. Baker testified that plaintiff sold him stumpage—standing timber—receiving therefor $29.78. Other witnesses, however, observed saw logs being hauled off the land and one witness cut thereon and delivered to plaintiff 1200 or 1250 fence posts.

Baker testified that plaintiff owned adjoining land which was de-

veloped and that "if land is developed all around these farms it makes them more valuable if they are developed." There is also a suggestion in plaintiff's brief that land values generally in that vicinity had increased since plaintiff's purchase. We do not think plaintiff is entitled to recover for such enhancement of value, the measure of recovery for improvements, when allowable, being the enhanced value of the land caused by the improvements. [See Sutton v. Anderson, 326 Mo. 304, 31 S. W. (2d) 1026, l. c. 1034, 1035.]

■ Plaintiff says in its brief that it had no notice of defendant's claim of title until the filing of defendant's answer and cross-bill, December 13, 1937. That was when the *amended* answer and cross-bill was filed. Defendant, by additional abstract, which is not challenged, shows the original answer and cross-bill, setting forth defendant's claim, was filed May 10, 1937. There was evidence indicating that some clearing was done in 1937, but whether before or after May 10th does not appear except that one witness, who moved onto a part of said Section 7, April 18, 1937, did some clearing, he did not say how much, "around the house," for which he was paid by the day. Plaintiff would not be entitled to recover for improvements made after notice of defendant's claim. [Sutton v. Anderson, supra.]

As to rents, Baker testified that plaintiff collected $729.73 in 1936 and $1,198.74 in 1937. The land in cultivation seems all to have been rented on a crop sharing basis and it does not clearly appear that plaintiff received all that was due it. It advanced provisions to at least some of the tenants to enable them to make a crop and it appears that some of those wound up in debt to plaintiff.

Tom Allen, the only witness who testified as to cash rental value, said that in a good year a very reasonable cash rental would be $5 per acre "and on a share basis you would get much more." He was experienced in buying and selling cotton and had been over the land in the summer of 1937 and he estimated the 518 acres would yield 500 bales of cotton. A standard bale of cotton is 500 pounds. [Webster's New International Dictionary.] Several of plaintiff's tenants testified that they raised about a bale per acre in 1937. It was shown that the price of cotton in that community in the fall of 1937 ranged from five cents per pound for "boll cotton" (which we gather was late cotton) to eight or nine cents for earlier and better cotton. At the minimum price 500 bales would bring a substantial sum. It was not shown what portion of the crop the owner received.

■■ This being an equity case we may make our own findings, but as the evidence was oral and conflicting and the trial court had the witnesses before it we may defer somewhat to its findings. After careful consideration of the evidence we believe the judgment was fair to plaintiff.

Appellant makes some complaint of the admission of evidence as to the cost of the improvements, saying that the *cost* was not the

measure of recovery. The court may not have and probably did not treat it as the measure of recovery. There are some other complaints, regarding procedural matters, which we think it unnecessary to discuss. The judgment is affirmed. *Westhues* and *Bohling, CC.,* concur.

PER CURIAM:—The foregoing opinion by Cooley, C., is adopted as the opinion of the court. All the judges concur.