Billy C. HANNA and Elma Hanna, Plaintiffs-Respondents,

v.

Bob NOWELL, Roy Alsup, Ross Alsup, and Richard Hanna, a partnership, d/b/a Alsup and Associates, Defendants-Appellants.

No. 7801.

Springfield Court of Appeals.

Missouri.

Dec. 19, 1959.

Robert A. Dempster, Daniel S. Norton, Sikeston, for defendants-appellants.

Weber Gilmore, Sikeston, for plaintiffs-respondents.

RUARK, Judge.

What is an eave? The principal question in this case involves construction, not of an eave, but an instrument which excepts eaves.

Defendants-appellants appeal from a mandatory injunction requiring them to remove all portions of a building which extend within eight feet of a property line.[1] The properties involved are located within Hunter Acres First Addition to the City of Sikeston, a residential district. There was in effect and of record a "Declaration in re: Conditions and Restrictions * * *" Paragraph h of said restriction as interpreted by the parties forbids the erection of any building which, with exception of eaves, extends closer than eight feet of the property line.[2]

---

1. "Whereupon, it is ordered, adjudged, and decreed, That the defendants * * * forthwith remove all that portion of the building referred to in the evidence which extends beyond a point within eight feet of the south boundary line of the following lot, two-wit: [description] so that no portion of said· building on said lot, including the roof thereof, will extend within the eight foot restricted line (that is, within eight feet of the south line of the within described lot) except that the roof may extend two inches beyond the gabled end of said building or structure."

2. Paragraph h is as follows:
   "No building shall be erected on any lot, any portion of which will, excepting eaves, cornices, or open uncovered terraces, extend beyond or encroach in front of the building line or building lines of

The best we can gather from a somewhat confusing record, it appears that the new dwelling house which is charged with offending against the restrictions is some 69 feet long across (north-south) the defendant Nowell's 85-foot lot. The south end of this house is what is rather commonly called a carport. A driveway 11 feet and 11 inches in width extends from the street to and under the carport. However, at the east entrance under the edge of the roof of the carport is set a 4 x 4 post which from the exhibit appears to be approximately 9 feet high. This post necessarily narrows the entrance into the carport to a width of 9 feet and 11 inches. It supports the weight of all that portion of the building on that side which extends over the carport. The front of the carport is of course open on both sides of the post. The south end (the offending end) is likewise open except for a low planter extending along the south edge. The rear of the carport is about halfway enclosed, and presumably the enclosure harbors another supporting post. The residence is one story with a ridge roof, and all that portion of the roof and all that portion of the building above the doors and windows extends in one continuous line and character of construction from north to south, over the carport and beyond the post heretofore mentioned, a distance which we find difficult to determine exactly from the record, but somewhere in the neighborhood of 3 feet. The south (upper) end of this extension has been boarded in or made into (at least the appearance of) a gable. The roof and roof covering down both sides of the "V" over the gable extend outward from the boarded-in wall some distance.

This extension of the roof and roof covering beyond the south wall of what we now refer to as the gable end will be hereinafter determined to be an eave as applied to the facts and record in this case, so we will refer to it as an eave. The record does not give us the distance this eave extends from the roof or gable end, nor are we able to say whether or not it is included in the approximate 3-foot distance which projects beyond the supporting carport post. Again referring to the picture exhibits, it would appear that such eaves stick out southward approximately 8 inches. The whole of the carport extension appears to have a finished ceiling. The supporting carport post which we have heretofore mentioned is (now) approximately 8 feet from the south property line and just within compliance with the 8-foot restriction. The upper portion, however, including the roof and all that part of the structure below it, including the beams which support it and the ceiling—that is, all that portion of the building above the doors and windows—extends southward beyond the post and to within approximately 5 feet and 1 inch of the south property line. Thus the upper portion of the building projects or hangs over and beyond the restriction line, although no part of it comes down to or is supported by anything which reaches to the ground within the restricted area.

Appellants' first and principal contention is that the whole projection is an "eave," and to sustain such contention they call upon the rules of construction normally applied to the interpretation of restrictions having to do with the free and untrammeled use of property.

such lots, as delineated or designated upon the plat of said addition, and on inside lots no building shall be erected closer than (8) feet to each side of each respective lot or lots referred to in (b) (1) and (b) (2) supra, or closer than (15) feet to each side of each respective lot or lots referred to in (b) (3) supra."

Both parties in trying the case below and in their briefs before this court have adopted the practical construction of this paragraph as permitting the exception of eaves and cornices in respect to intrusion against the side property line restrictions; and since they do so we do not concern ourselves with construction of the restriction in respect to whether such exception applies. Those interested in the question of whether eaves are automatically excepted might see 14 Am.Jur., Covenants and Conditions, sec. 275, p. 639; 1 A.L.R. annotation 329.

The attitude of the courts is that covenants of restriction are not favorites of the law and where the meaning is doubtful and construction is called for they will be construed strictly according to their plainly expressed language. They will not be extended by implication, and any reasonable doubt as to their meaning will be resolved in favor of the free use of the land.[3] Of course if the meaning is plain and not ambiguous, no construction is called for.[4] The primary object in construing any instrument of this character is to ascertain the intention of the parties, and this almost necessarily requires an inquiry into the purpose which the parties sought to accomplish. Such purpose may be gathered not only from the particular clause or phrase under scrutiny but as it may be understood in the light of all other provisions of the instrument.[5] And unless it appears that the words of the restriction are intended to be used and interpreted in a technical or restricted sense, the language is to be read and applied according to the plain, everyday or popular meaning of the words.[4]

Adverting now to the word "eaves": Appellants say an eave is *any* projection of the roof. Respondents say an eave is only the projection of the *lower* edge of the roof. We think both are wrong in this case.

Webster's New International Dictionary, 2d ed., says eaves are "the edges or lower borders of the roof of a building which overhang the walls." (This is respondents' theory.)

Funk & Wagnalls New Standard Dictionary of the English Language defines eaves as "the projecting edge of a roof, serving to shed rain-water."

It is said that eaves are "the edges of the roof projecting beyond the face of the walls." 28 C.J.S., p. 826, citing Proprietors of Center St. Church v. Machias Hotel Co., 51 Me. 413, 414. (Appellants say the structure here is such an extension.)

"While there is a great variety in the design of eaves, in order to express the character of the building and the mood of the architect, * * * in all cases the practical purpose is to close the junction of the roof rafters with the wall construction and to dispose of the water flowing down the roof slope." Charles Merrick Gay and Harry Parker, Materials and Methods of Architectural Construction, p. 205.

Milton refers to eaves in language

While rocking winds are piping loud,
Or ushered with a shower still,
When the gust hath blown his fill,
Ending on the rustling leaves,
With minute-drops from off the eaves.[6]

If we indulge in recollection of our grandfathers when they built their log cabins of native oak, lime and horsehair were not at first available for chinking. The rain was wont to run down, seep through and between the logs, and wash the mud or clay down the walls; and the wind would blow rivulets of the dripping or seeping water between the cracks, not only along the sides but on the front and back as well. An overhang was just as necessary on the slanting ends as on the sides which had the lower edges of the roof. Hence this overhanging portion of

---

3. Chiles v. Fuchs, 363 Mo. 114, 249 S.W. 2d 454; Gieseke v. Doyel, Mo.App., 290 S.W.2d 189; Breadon v. Paugh, 330 Mo. 127, 48 S.W.2d 853; Zinn v. Sidler, 268 Mo. 680, 187 S.W. 1172, L.R.A.1917A, 455; Prendergast v. Blomberg, Mo.App., 141 S.W.2d 156.

4. 26 C.J.S. Deeds § 163b, p. 1105; Hickey v. Greengard, Mo.App., 176 S.W.2d 661; Pavey & Orr v. Burch, 3 Mo. 447; Porter v. Johnson, 232 Mo.App. 1150, 115 S.W. 2d 529; Andrews v. Metropolitan Bldg. Co., 349 Mo. 927, 163 S.W.2d 1024.

5. 26 C.J.S. Deeds § 163, p. 1094, et seq.; Kraemer v. Shelley, 355 Mo. 814, 198 S.W.2d 679; Cook v. Tide Water Associated Oil Company, Mo.App., 281 S.W. 2d 415; Godfrey v. Hampton, 148 Mo. App. 157, 127 S.W. 626.

6. "Il Penseroso," ll. 126–130.

the roof became a shelter part which furnished partial shelter to a part of the shelter. The extension of the roof covering, or the overhang, in order to keep the dribbling water from creeping between the walls, was one application of resourcefulness on the part of those sturdy pioneers from whom we have degenerated. Many of the necessities of our forefathers have disappeared in our present-day gadgeteered and debilitated life, but the meaning of words, the image produced by their expression, is still a part of our inheritance. Conceding that an eave may serve several purposes, we believe that technically, poetically, and historically its *fundamental and basic* purpose is to keep the rain from running down the exterior sidewalls. A reasonable extension of the roof edge which fulfills that purpose is an eave, and we believe that is its common or popular meaning.

This we think is a liberal interpretation of the meaning of an eave exception. But this interpretation does not mean that any and *all* extensions from the end are eaves. If the basic function is to keep water from the exterior walls, a departure from such basic purpose in pursuit of an entirely different end and to perform another totally different function destroys its character, and appellant's contention becomes a false syllogism, i. e., an eave is an extension of the roof; a carport is an extension of the roof; *ergo* a carport is an eave. Not by applying either the lubricant of liberality, even imagination, of liberal construction, or the astringency of strict construction, can we compress the upper part of this structure, which is the whole end of the building, into an eave. Its purpose is not to furnish shelter to an exterior wall; there is no exterior wall below it. Its purpose obviously is twofold: one, to furnish shelter to persons getting in and out of automobiles, and, two, to fill out and balance the outlines of the building (although

in that respect it does not balance or conform with the "other eaves" around the house). But even if the sole function and purpose sought to be accomplished were that of an eave, it would still not *be* an eave, because it is exaggerated into something of entirely different character. It is stretching an inch into an ell, an instant into a minute, gray into black, a greeting into a courtship, a candidate into a statesman, a moronic television advertising blurb into a scientific truth—and in the stretching the true character is lost. Thus, while we believe that the few-inch extension of the roof proper can under the facts of this case be properly classified as an eave, the extension (overhang) of the whole gable end of the building is not an eave and is in violation of the restriction.

■ What we have heretofore said concerning the construction of the instrument we think disposes of appellants' contention that the restriction was so ambiguous as to be void. The whole instrument is too lengthy to set forth here, but it is obvious that the purpose was to provide uniformity and secure a certain amount of space, light, and air to the adjoining owners. It is made ambiguous only when the parties attempt to apply unreasonable meanings and bend and strain it to such ends as would defeat its very obvious purposes.[7]

Appellants also contend that plaintiffs are estopped, and this requires a further look at the facts. On July 17, 1958, defendant Nowell obtained from the building inspector of the City of Sikeston a building permit to construct the dwelling. Although the restriction was of record, the permit authorized a building which was, in respect to proximity to property line, in violation thereof. Nowell, while he had constructive knowledge, was actually ignorant of the restriction and proceeded to build as hereinbefore stated. Sometime in August construction had reached the

7. Mickelberry's Food Products Co. v. Haeussermann, Mo., 247 S.W.2d 731, 738; Mutual Ben. Health & Acc. Ass'n v. Hobbs, 8 Cir., 186 F.2d 321, 323; Chicago, R. I. & P. Ry. Co. v. Maryland Casualty Co., 8 Cir., 75 F.2d 596, 600.

point where the definite lines of the building had taken visible form, the rafters were up and the roof was on (although not the roof covering), and temporary posts had been set up on the south edge of the carport, although the driveway had not yet been laid. At the south end of the ridge of the roof a board (called a ribbon board) extended southward yet another or *additional* 2 to 2½ feet toward the property line. We gather that the plan or intention was to eventually cover this extended board with a triangular bit of roof and thus make what we might describe as the bill of a cap or a widow's peak. At that point the plaintiff Billy C. Hanna, who was the homeowner on the immediate south, made protest and called attention to the restrictions. Nowell made some investigation and thereafter there was some discussion between the two. The parties went over to plaintiffs' house, measured the carport, and concluded that 10 feet would be a sufficient distance to permit reasonable usage. (Apparently a 13-foot driveway had been planned.) According to plaintiffs, it was then agreed that the posts would be set back to allow (only) a 10-foot width for the carport. "He agreed to the ten foot figure for the distance for the carport." Plaintiff Hanna said it was his understanding that the *whole* end of the structure was to be cut back to 10 feet. "In other words, the gable. Cut the whole end of the house off and make the house flush here." Further on the testimony was that 2 *feet* was to be taken off the carport and the posts were to be "set in" 1 foot (in and under the carport overhang?).

Several days after the parties had "agreed" to the cutback, Nowell came to Hanna's home during mealtime and asked him to step outside and look at the house. Hanna's testimony as to this conversation is as follows:

"I went out and looked at it, and I told him that looked a lot better, and when he got it cut down to this—we even stepped towards the building—to

point out where that would be—the two posts would be—"

Again:

"He said, 'I want you to look at it now because we have cut it off,' and I went out there, and the first thing I noticed, and I had noticed that day it was cut off, but I didn't measure a thing when we had our conversation, and I took it for granted without measuring that this was cut off the two feet that he agreed to and he was going to set the posts in one foot." (As we gather it was the ribbon board which had been cut off.)

And again:

"I told him that it looked much better, and that when he got that post set in there I would think it would look all right. Then I measured it and then I wrote him the letter."

The letter he referred to was one insisting upon full compliance with the restrictions. It was written on September 9. The conversation last above referred to occurred sometime before, but the record does not clearly show exactly where it took place, except that it was sometime during the latter part of August. A defendants' witness said it was "somewhere around the 17th or 20th."

▆ As nearly as we can determine from the record, the 2-foot "cutback" done in compliance with the previous "agreement" consisted (only) in taking a saw and cutting off the ribbon board which stuck out to support the contemplated widow's peak. Otherwise the gable end was not reduced. And we are not able to find from the record evidence of anything *further* being done between the date of the first conversation quoted and the date of the letter which Hanna wrote on September 9 insisting on full compliance. Quite evidently Nowell did at *some* time set the posts back to the line, board in the end of the gable, decorate the overhang of the

roof which we have said was an eave, and (probably) build a ceiling in the carport. All of this was finished and painted. It might be that this finishing work was done before the letter of September 9 insisting upon full compliance was written, but we do not find such proof in the record, and, estoppel being an affirmative defense, the burden is upon the party asserting it to clearly establish every element which makes the estoppel.[8]

■ One of the essential elements of equitable estoppel is that the party asserting it must have been induced or misled into giving up something of substantial value or into changing his position so that he will suffer loss if the other party is not prevented from taking a contrary position. In other words, the party claiming the estoppel must have acted to his injury.[9] As we have said, we are unable to find that Nowell did anything in reliance upon a belief that what he did was satisfactory to the plaintiffs except to saw off the end of a board. We think this cannot be parlayed into a substantial change of position. Hanna said he made the remark before measuring, then afterwards he measured, found the end was *not* set back, as had been previously agreed, and wrote the letter. Anything Nowell did to complete the building after receipt of that letter could not have been in innocent reliance upon the belief that plaintiffs were satisfied and would not object.

■ Furthermore, a party is not to be estopped if he was innocently, and without negligence on his part, not in possession of the true facts upon which he made the declaration.[10] Nor can the statement of the plaintiff that he thought it would "look all right" amount to waiver (which is half-brother to an estoppel), because waiver requires the knowledge of an existing right *and* an intention to relinquish it. It "is not a trick to catch one napping."[11] Nor is a person ordinarily to be estopped by what is only a mere expression of opinion.[12] When the plaintiff made the statement he thought "it would look all right" the house was still under construction. The carport end was still supported by temporary posts and the driveway under and out of it had not been laid. The remark was made without measuring, and when plaintiff *did* measure he withdrew the effect of that remark. We think the record in this case does not justify a finding of estoppel against the plaintiffs.

■ But even though there be infringement and the plaintiffs are not es-

8. Sec. 509.090, V.A.M.S.; John Hancock Mutual Life Insurance Company v. Dawson, Mo.App., 278 S.W.2d 57; Sutorius v. Mayor, 350 Mo. 1235, 170 S.W.2d 387, 171 S.W.2d 69; Pike v. Menz, 358 Mo. 1035, 218 S.W.2d 575; Emery v. Brown Shoe Co., Mo., 287 S.W.2d 761.

9. 31 C.J.S. Estoppel § 72b, p. 275; 19 Am.Jur., Estoppel, sec. 34, p. 634; Commerce Trust Company v. Weed, Mo., 318 S.W.2d 289; Klaar v. Lemperis, Mo., 303 S.W.2d 55; Mills v. Taylor, Mo., 270 S.W.2d 724, and cases cited at loc. cit. 729; State on inf. of McKittrick, ex rel. City of California v. Missouri Utilities Co., 339 Mo. 385, 96 S.W.2d 607, 106 A.L.R. 1169; Wilkinson v. Lieberman, 327 Mo. 420, 37 S.W.2d 533.

10. 31 C.J.S. Estoppel § 70a, p. 264; Missouri Pac. R. Co. v. Askew Saddlery Co., 215 Mo.App. 277, 256 S.W. 566, 571;

Delta Realty Co. v. Hunter, 347 Mo. 1108, 152 S.W.2d 45, 52; Haggerty v. St. Louis Police Relief Ass'n, Mo.App., 141 S.W.2d 174(6); Oldham v. Wade, 273 Mo. 231, 200 S.W. 1053.

11. 92 C.J.S. Waiver p. 1053, et seq.; Guenther v. Metropolitan Life Ins. Co., Mo.App., 189 S.W.2d 126; Swihart v. Missouri Farmers Mut. Tornado, Cyclone & Windstorm Ins. Co., 234 Mo.App. 998, 138 S.W.2d 9, 17; Willibald Shaefer Co. v. Blanton Co., Mo.App., 264 S.W.2d 920; Hudson v. Price, Mo.App., 273 S.W.2d 518(6).

12. 19 Am.Jur., Estoppel, sec. 54, p. 660; Biggs v. Modern Woodmen of America, 336 Mo. 879, 82 S.W.2d 898, 909; Thomas v. Modern Woodmen of America, 218 Mo.App. 10, 260 S.W. 552, 555; Central States Life Ins. Co. v. Bloom, 345 Mo. 982, 137 S.W.2d 517.

topped, it is not every case in which equity will issue a mandatory injunction to compel the removal of a part of a building which extends beyond the restriction line. This remedy, which is said to be "the strong arm of the court," is a matter of discretion, to be applied with caution and used sparingly.[13] It will not usually intervene in trivial matters, or where the injunction will work little benefit to plaintiff and cause oppression or great hardship to the defendant. In such cases the plaintiff is relegated to his legal remedy.[14] It is impossible to lay down any absolute rule to govern the exercise of this discretion in all instances. Each case must be judged upon the equities as they appear from its own facts. In such instances the courts have considered, in addition to the balance of the conveniences, the "willfulness" of the defendant and the conduct of the plaintiff in regard to acquiescence, laches, and unclean hands, including his own violation of the restrictions.[15]

Without lengthening this opinion by further discussion, we are of the opinion that the violation is not trivial and that the defendants were not entirely innocent or put upon. We will discuss the question of plaintiffs' violation of the restrictions in our consideration of the counterclaim. We are of the opinion that the defendants should have been enjoined.

As to the defendants' counterclaim contention that plaintiffs also violated the restriction: The only evidence we

find in the record is that plaintiff Hanna, on cross-examination, admitted that he was, according to defendants' plat exhibit, over the line (within the 8 feet) with the north end of his house a distance of 2 inches. The plat does not show what *part* of his residence was "over the line," but an examination of the exhibits shows that composition shingles stuck out (north) over and beyond the wooden end of the roof that approximate 2-inch distance. The "admission" must be considered in the light of plaintiffs' contention and belief that there could be no eaves except on the lower edges of the roof. We have already said that, as applied to the facts in this case, eaves can also extend a reasonable distance over the gable end. Regardless of any temptation there might be to apply the principle of "he who lives by the sword * * *," we are of the opinion (a) the 2-inch extension of the shingles was a part of the eave (even though it be contrary to plaintiffs' own contention), and (b) in any event it was trivial in this situation;[16] and, there being no evidence that the trivial extension was willful, it does not merit the attention of a court of equity.[17]

We are of the opinion that defendants should be permanently enjoined from maintaining any portion of the building structure, except eaves as herein defined, at a distance closer than 8 feet from the boundary line which separates the property of the plaintiffs and defendant Nowell. We are further of the opinion that the exten-

13. 28 Am.Jur., Injunctions, sec. 3, p. 491; see cases at West's Missouri Digest, Injunction ⊜1.

14. St. Louis Safe Deposit & Savings Bank v. Kennett Estate, 101 Mo.App. 370, 74 S.W. 474; Forsee v. Jackson, 192 Mo. App. 408, 182 S.W. 783; Mathews Real Estate Co. v. National Printing & Engraving Co., 330 Mo. 190, 48 S.W.2d 911, 81 A.L.R. 1039; Putnam v. Coates, 220 Mo.App. 218, 283 S.W. 717.

15. Compton Hill Improvement Co. v. Strauch, 162 Mo.App. 76, 141 S.W. 1159, 1162; Duke v. Crossfield, 241 Mo.App.

579, 240 S.W.2d 180; Smith v. Spencer, 81 N.J.Eq. 389, 87 A. 158; see 57 A.L.R., annotation, 336, et seq.; see also Wadlow v. Consolidated School District No. 3, Mo.App., 212 S.W. 904, 905; Shubert v. Woodward, 8 Cir., 167 F. 47, 57; and cases supra.

16. Of course, a 2-inch extension could in some circumstances become decidedly important, but we think it was not so in this case.

17. See 43 C.J.S. Injunctions § 87b(4)(d)aa, p. 586; Forsee v. Jackson, 192 Mo.App. 408, 182 S.W. 783.

sion of the roof and roof covering (not the walls or other portion of the structure) beyond and south of the wall of the gable end is a reasonable extension in length and overhang in order to constitute the (excepted) eaves; that the counterclaim of defendants was properly dismissed and that defendants should be charged with all costs, including the cost of this appeal. The sum and effect of our opinion is that the judgment of the court is approved in all things except and in effect to allow the defendants to extend the south end eaves a distance compatible with their present overhang, instead of the 2-inch extension of the whole building as permitted by the trial court.

The circuit court is directed to make such orders as may be necessary to effect judgment in compliance with this opinion, and, if the parties cannot agree, may take further evidence in order to fix and determine the actual distance which the eaves should extend in compliance herewith.

STONE, P. J., and McDOWELL, J., concur.